MAZDA MOTORS OF AMERICA, INC. v. SOUTHWESTERN MOTORS, INC., D/B/A MAZDA OF RALEIGH

No. 7710SC299

(Filed 18 April 1978)

1. **Constitutional Law § 23; Contracts § 6— right to contract—statutory restrictions**

    The right to make contracts is subject to the power of the General Assembly to impose restrictions for the benefit of the general public in areas of public interest and to prevent business practices deemed harmful.

2. **Constitutional Law §§ 14, 25.1; Contracts § 17.2— termination of automobile dealership franchise—notice to Commissioner of Motor Vehicles—constitutionality**

    The statute requiring a filing of notice with the Commissioner of Motor Vehicles prior to the termination of an automobile dealership franchise agreement, G.S. 20-305(6), does not impair the obligation of contracts in violation of Art. I, § 10, Cl. 1 of the U. S. Constitution or amount to a taking without compensation; rather, the statute constitutes a reasonable exercise of the police power by the State in futherance of the public welfare.

3. **Statutes § 8.1— notice of termination of automobile dealership franchise—retroactive application**

    The statute requiring the filing of notice prior to termination of automobile dealership franchise agreements, G.S. 20-305(6), is not made unconstitutional by retroactive application to contracts existing before the statute became effective.

4. **Constitutional Law § 33— automobile dealership franchise—notice of termination—no ex post facto law**

    Although criminal sanctions are provided for violations of G.S. 20-305(6), application of the statute to existing contracts does not constitute an ex post facto law prohibited by Art. I, § 10, Cl. 1 of the U. S. Constitution since that

1

clause applies only in cases in which a crime is created or punishment for a criminal act is increased after the fact and does not speak to the effect of statutes passed after the fact when employed in civil cases.

**5. Contracts §§ 6, 17.2— automobile dealership franchise—failure to give notice of termination—attempted termination void**

An agreement to terminate an automobile dealership franchise contract was contrary to public policy, illegal and void *ab initio* where the notice required by G.S. 20-305(6) was not given to the Commissioner of Motor Vehicles prior to termination of the contract. Similarly, plaintiff distributor's notice to defendant dealer by letter of the termination of the franchise was also void where it did not comply with the notice requirements of G.S. 20-305(6).

**6. Contracts § 17.2— termination of automobile dealership franchise—contract provisions contrary to statute**

An automobile dealership franchise agreement did not terminate pursuant to provisions of the agreement calling for its automatic termination on a certain date where the notice of termination required by G.S. 20-305(6) was not given to the Commissioner of Motor Vehicles, since the statute expressly provides that its terms will predominate over contrary contractual agreements, and the statute cannot be nullified by contract.

**7. Contracts § 6— contract provisions against public policy—severability of valid provisions**

Where certain provisions of a contract are against public policy and will not be enforced, their invalidity will not invalidate the remaining valid provisions of the contract if the valid provisions are severable and may be enforced independently of the illegal provisions.

**8. Contracts §§ 6, 17.2; Injunctions § 8—attempted termination of automobile dealership franchise—failure to give notice**

The trial court erred in failing to rule as a matter of law that attempts by plaintiff distributor to terminate an automobile dealership franchise agreement without giving the notice required by G.S. 20-305(6) were void as against public policy and in enjoining defendant from representing itself as an automobile dealer and from continuing to refuse to allow plaintiff to conduct an inventory of its parts, accessories and equipment.

**9. Uniform Commercial Code § 75— perfection of security interest—filing—relevancy only to third-party claims**

The perfection of a security interest pursuant to G.S. 25-9-302 and G.S. 25-9-401(1)(c) by filing a financing statement with the Secretary of State is relevant only to third-party priority claims and not to disputes between the secured party and the debtor.

**10. Uniform Commercial Code § 73— security interest—giving of value**

There was sufficient evidence to support a finding that a bank had given value for its security interest in defendant's inventory where the security agreement between defendant and the bank showed that the inventory was to serve as additional collateral for a $110,000 bank loan. G.S. 25-9-204(1); G.S. 25-1-201(37).

Mazda Motors v. Southwestern Motors

**11. Accounts § 2— account stated**

      An account is an account stated when a balance is struck and agreed upon as correct, and the agreement may be either an express agreement or an agreement implied by failure to object within a reasonable time after the other party has calculated the balance and submitted a statement of the account.

**12. Accounts § 2—account stated—letter not stating specific amount owed**

      A letter from plaintiff to defendant stating that parts and tools from another dealer had been placed in defendant's inventory and that the indebtedness for these parts and tools would be transferred to defendant's account could not be the basis for a finding that defendant was liable to plaintiff for a certain sum upon an account stated where the letter stated no specific balance or amount owed by defendant.

APPEAL by defendant, Southwestern Motors, Inc., d/b/a Mazda of Raleigh, from *Bailey, Judge.* Judgment entered 24 November 1976 in Superior Court, WAKE County. Heard in the Court of Appeals 2 February 1978.

This is an action for breach of contract. It arose from a dispute involving the termination of an automobile dealership franchise agreement.

During the Fall of 1971 the plaintiff appellee's predecessor in interest, Mazda Motors of Florida, Inc., granted the defendant appellant a franchise to open a dealership in Raleigh, North Carolina for the sale of Mazda automobiles. The defendant appellant, Southwestern Motors, Inc., d/b/a Mazda of Raleigh, began its activities as an authorized Mazda dealer early in January of 1972. At some point in 1973, defendant and Mazda Motors of Florida, Inc., plaintiff's predecessor in interest, entered into a written contract titled "Mazda Direct Dealer Agreement" which was dated 1 January 1973. This agreement incorporated by reference the "Mazda Direct Dealer Agreement Terms and Provisions" dated 1 May 1971. The plaintiff, Mazda Motors of America, Inc., assumed all rights and obligations of Mazda Motors of Florida, Inc. on 1 May 1971 by virtue of a corporate merger of the two effective on that date.

In May 1974 the plaintiff requested the defendant enter into an agreement with the plaintiff mutually terminating any and all agreements the parties had at anytime entered. The defendant refused.

By letter dated 3 June 1974, the defendant was notified that any and all agreements with the plaintiff for the conduct of a

Mazda dealership were terminated effective 18 June 1974. Notice of the contents of this letter was sent to the Commissioner of Motor Vehicles by a representative of the plaintiff in a letter dated 7 June 1974.

The defendant and the plaintiff executed a document on 10 July 1974 declaring that, effective 31 August 1974, they mutually terminated all agreements at anytime entered into between them including the Mazda Direct Dealer Agreement dated 1 January 1973. Notice of this document was sent to the Commissioner of Motor Vehicles on 14 October 1974.

The defendant continued its operations as a Mazda dealer after 31 August 1974 and refused to let representatives of the plaintiff enter its premises to take an inventory of parts. The plaintiff filed this action in the Superior Court of Wake County alleging the defendant had breached the terms of the Mazda Direct Dealer Agreement and of the 1971 Mazda Direct Dealer Agreement Terms and Provisions. The plaintiff prayed that the defendant be permanently enjoined from representing itself as a Mazda dealer in any manner and from preventing the plaintiff from taking an inventory of parts, accessories, special tools and equipment, and authorized signs. The plaintiff also sought a temporary restraining order and preliminary injunction to the same effect pending a final determination on the merits. The plaintiff sought leave to amend its complaint to plead damages after having completed its inventory.

The plaintiff's motion for a temporary restraining order was granted, and its motion for a preliminary injunction was later heard and granted. The trial court preliminarily enjoined the defendant from representing itself as a Mazda dealer and from continuing to refuse to allow the plaintiff to conduct an inventory. After obtaining extensions of time in which to answer, the defendant answered the plaintiff's complaint and counterclaimed against the plaintiff for compensatory and punitive damages. The plaintiff replied to the counterlcaim, and the case came on for trial before the court without a jury on 15 November 1976. At this time the trial court allowed the plaintiff's motion to amend its complaint to allege specific damages. In its final judgment entered on 24 November 1976, the trial court, *inter alia*, made permanent the injunctive relief previously granted the plaintiff

against the defendant. The final judgment also determined all remaining questions as to the rights and duties of the parties raised by the pleadings. From this judgment the defendant appealed.

Other relevant facts are hereinafter set forth.

*Poyner, Geraghty, Hartsfield & Townsend by John J. Geraghty, David W. Long and Cecil W. Harrison, Jr., for plaintiff appellee.*

*Newsom, Graham, Strayhorn, Hedrick, Murray, Bryson & Kennon by Josiah S. Murray III, and Lewis A. Cheek, for the defendant appellant.*

MITCHELL, Judge.

The defendant first assigns as error the failure of the trial court to rule that, as a matter of law, the franchise agreement between the parties was wrongfully terminated, canceled or not renewed. For reasons which will be discussed hereinafter, we find this assignment to be meritorious and hold that the trial court committed error in failing to so rule.

By the enactment of Article 12 of Chapter 20 of the General Statutes, the Motor Vehicle Dealers and Manufacturers Licensing Law, the General Assembly sought to regulate and license motor vehicle manufacturers, distributors, dealers and salesmen in the conduct of their business in North Carolina. We are here concerned with G.S. 20-305(6) which became effective upon ratification on 16 March 1973. By enactment of that section, the General Assembly declared:

> It shall be unlawful for any manufacturer, factory branch, distributor, or distributor branch, or any field representative, officer, agent, or any representative whatsoever of any of them:
>
>    . . . .
>
> (6) Notwithstanding the terms of any franchise agreement to terminate, cancel, or refuse to renew the franchise of any dealer, without good cause, and unless (i) the dealer and the Commissioner have received written notice of the franchisor's intentions at least 60 days prior to the effective date of such termination, cancellation, or the expiration date of the franchise, setting forth the specific grounds for such

action . . . except in the event of fraud, insolvency, closed doors, or failure to function in the ordinary course of business, 15 days' notice shall suffice; provided that in any case where a petition is made to the Commissioner for a determination as to good cause for the termination, cancellation, or nonrenewal of a franchise, the franchise in question shall continue in effect pending the Commissioner's Decision. . . .

The trial court found and concluded that the franchise agreement between the parties to this action was terminated both by its own terms calling for its expiration on 31 December 1973 and by the "mutual agreement" effective on 10 July 1974. In arriving at these findings and conclusions, the trial court found the requirements of G.S. 20-305(6) to be unconstitutional as impairing the obligations of contracts. We hold these findings and conclusions by the trial court to be erroneous. We further hold that G.S. 20-305(6) is not a state "law impairing the obligations of contracts" in the constitutional sense.

The authority of the courts of this State to declare an act of the General Assembly unconstitutional was established in *Bayard v. Singleton*, 1 N.C. 5 (1787). In that case the courts of North Carolina adopted the doctrine of judicial review, which was recognized sixteen years later by the Supreme Court of the United States in *Marbury v. Madison*, 5 U.S. 137, 2 L.Ed. 60 (1803).

In order to determine the rights and the liabilities or duties of the parties, our courts must often determine which of two conflicting rules of law is superior. Should there be a conflict between a statute and the Constitution, courts must determine the rights and the liabilities or duties of the parties before them in accordance with the Constitution, as it is the superior rule of law in such situations. In these situations, however, courts will not anticipate other questions of constitutional law not necessary to the determination of issues presented by the litigation before them. *Nicholson v. Education Assistance Authority*, 275 N.C. 439, 168 S.E. 2d 401 (1969). With these rules for our guidance, we undertake an analysis of the constitutional issue here presented.

[1] The Constitution of the United States specifically forbids any state law impairing the obligations of contracts. U.S. Const. art. I, § 10, cl. 1. It has long been recognized, however, that the "con-

tracts clause" grants a qualified and not an absolute right. Clearly, the right to make contracts is subject to the power of the General Assembly to impose restrictions for the benefit of the general public in areas of public interest and to prevent business practices deemed harmful. *Morris v. Holshouser*, 220 N.C. 293, 17 S.E. 2d 115 (1941).

The General Assembly, within Article 12 of Chapter 20 (G.S. 20-285), made specific legislative findings of fact as follows:

> The General Assembly finds and declares that the distribution of motor vehicles in the State of North Carolina vitally affects the general economy of the State and the public interest and public welfare, and in the exercise of its police power, it is necessary to regulate and license motor vehicle manufacturers, distributors, dealers, salesmen, and their representatives doing business in North Carolina, in order to prevent frauds, impositions and other abuses upon its citizens.

By these legislative findings of fact, the General Assembly specifically based its action on the police power and declared the requirements of the statute here in question to promote the vital interests of the public and the public welfare. The initial responsibility for determining the public welfare unquestionably rests with the legislature, and its findings with reference thereto are entitled to great weight. Additionally, the presumption is that the judgment of the General Assembly is correct and constitutional, and a statute will not be declared unconstitutional unless this conclusion is so clear that no reasonable doubt can arise. *Mitchell v. Financing Authority*, 273 N.C. 137, 159 S.E. 2d 745 (1968).

It has been recognized for at least two decades that automobile franchises are in reality unilateral contracts, as the terms are dictated by the manufacturers and distributors with the avowed purpose of protecting themselves to the utmost and granting as little protection as possible to the dealer. *Buggs v. Ford Motor Co.*, 113 F. 2d 618 (7th Cir. 1940), *cert. denied*, 311 U.S. 688, 85 L.Ed. 444, 61 S.Ct. 65 (1940); Annot., 7 A.L.R. 3d 1173 (1966). The disparity of bargaining power between a manufacturer or distributor on the one hand and a local dealer on the other has caused automobile franchise agreements to be referred to as "contracts of adhesion." Local dealers entering into automobile fran-

chise arrangements were so systematically denied redress in cases of arbitrary termination or nonrenewal, that the franchise agreements were sometimes referred to as an "economic death sentence." Kessler, *Automobile Dealer Franchises: Vertical Integration by Contract*, 66 Yale L.J. 1135, 1156 (1957). It would be safe to say that there was near unanimity in the view that, due to the tremendous disparity in the bargaining powers of the parties, automobile franchise agreements uniformly worked to the detriment of the local dealers and, thereby, the general public. See Kessler, *Automobile Dealer Franchises: Vertical Integration by Contract*, 66 Yale L.J. 1135 (1957); Brown and Conwill, *Automobile-Dealer Legislation*, 57 Columbia L. Rev. 217 (1957); Weiss, *The Automobile Dealer Franchise Act of 1956—An Evaluation*, 48 Cornell L.Q. 711 (1963).

Agreement that automobile franchise contracts had been used to the public detriment was not limited to legal scholars. As early as 1939, the Federal Trade Commission had indicated its feeling that these franchises were being used to the detriment of smaller economic entities. 1939 FTC Rep. 139-46. In 1956 these concerns were reiterated by the United States Senate. S. Rep. No. 3791, 84th Cong., 2d Sess. 3-4 (1956); See, *e.g.*, Kessler, *Automobile Dealer Franchises: Vertical Integration by Contract*, 66 Yale L.J. 1135, 1139-40 (1957).

The intricacies of the economic and legal problems raised by the national trends in automobile franchising agreements led courts quickly to recognize that they, unlike commissions and legislative bodies, were unable to weigh the various subtle and conflicting factors involved. As was expressly stated by the court in *Bushwick-Decatur Motors, Inc. v. Ford Motor Co.*, 116 F. 2d 675, 677 (2d Cir. 1940):

> To attempt to redress this balance by judicial action without legislative authority appears to us a doubtful policy. We have not proper facilities to weigh economic factors, nor have we before us a showing of the supposed needs which may lead the manufacturers to require these seemingly harsh bargains.

Faced with this background, the General Assembly determined that Article 12 of Chapter 20 of the General Statutes, seeking to regulate such automobile franchises and the parties thereto,

was vital to the general economy of the State and to the public welfare. G.S. 20-285. Acting pursuant to its police powers, the General Assembly passed Article 12 in 1955. After almost two decades of additional experience with the economic and social factors involved in automobile franchises, the General Assembly amended Article 12 to include G.S. 20-305(6).

During the New Deal era, the Supreme Court of the United States, speaking through Chief Justice Hughes, emphasized that the states had clear authority under their police powers to regulate contract rights in the interest of insuring the public's economic well-being. *Home Building & Loan Association v. Blaisdell*, 290 U.S. 398, 78 L.Ed. 413, 54 S.Ct. 231 (1934). Judicial scrutiny of economic legislation has been consistently relaxed since that time, as reflected in the more recent cases concerning the contract clause. *City of El Paso v. Simmons*, 379 U.S. 497, 13 L.Ed. 2d 446, 85 S.Ct. 577 (1965), *reh. denied*, 380 U.S. 926, 13 L.Ed. 2d 813, 85 S.Ct. 879 (1965); *The Supreme Court, 1976 Term*, 91 Harv. L. Rev. 1, 89 (1977).

During its 1976 Term, the Supreme Court of the United States, by its decision in *United States Trust Co. v. New Jersey*, 431 U.S. 1, 52 L.Ed. 2d 92, 97 S.Ct. 1505, *reh. denied*, 431 U.S. 975, 53 L.Ed. 2d 1073, 97 S.Ct. 2942 (1977), "revived the all-but-moribund contract clause" by striking down a state effort to repeal retroactively a statutory bondholders' convenant precluding a public port authority from investing its revenues or reserves in railway mass transit facilities. *The Supreme Court, 1976 Term*, 91 Harv. L. Rev. 1, 84 (1977). In *United States Trust*, however, the Court specifically indicated that legislative modification of private contracts should be viewed with the deference that courts have accorded economic regulation since the 1930's. The majority, speaking through Justice Blackmun, explained the heightened standard of scrutiny of state regulation in that case by referring to the greater "self-interest" involved on the part of a state when it is a party to the contract to be altered. This factor of "self-interest" is absent in the present case, and *United States Trust* provides us little assistance here.

[2] The more recent decisions involving contracts between private parties tend to concentrate upon whether the state law in question involves a disturbance of essential or core expectations

arising from the particular type of contract. Those cases tend to indicate that such expectations are not disturbed unless the demoralizing effects of state legislation are so great as totally to discourage the parties and others from entering such contracts and to constitute, thereby, a taking. *City of El Paso v. Simmons*, 379 U.S. 497, 13 L.Ed. 2d 446, 85 S.Ct. 577 (1965), *reh. denied*, 380 U.S. 926, 13 L.Ed. 2d 813, 85 S.Ct. 879 (1965); *Pittsburgh v. Alco Parking Corp.*, 417 U.S. 369, 379, 41 L.Ed. 2d 132, 140, 94 S.Ct. 2291, 2297 (1974) (Powell, J., concurring); *The Supreme Court, 1976 Term*, 91 Harv. L. Rev. 1, 91 n. 59. Although it is true that any alteration of a contract is, to some extent, an "interference" with the contract, we find that G.S. 20-305(6) does not involve any disturbance of essential or core expectations or amount to a taking without compensation. Rather, it constitutes a reasonable exercise of the police power by the State in furtherance of the public welfare.

We find additional support for our conclusion of constitutionality in cases dealing with similar federal and state acts. The Federal Automobile Dealers' Day in Court Act (15 U.S.C. §§ 1221-1225) is somewhat analogous to Article 12 of Chapter 20 of our General Statutes. It goes beyond the provisions of that article, however, and provides the local dealer with an integrated system of remedies against the larger economic entities involved in franchise agreements. No court has declared the federal act unconstitutional. Several courts have found it to support the public welfare. *Volkswagen Interamericana, S.A. v. Rohlsen*, 360 F. 2d 437 (1st Cir. 1966), *cert. denied*, 385 U.S. 919, 17 L.Ed. 2d 143, 87 S.Ct. 230 (1966); Annot., 7 A.L.R. 3d 1173, 1178 (1966). Additionally, at least one court has specifically held that act does not unconstitutionally restrict the freedom of contract or take property without due process of law. *Blenke Brothers Co. v. Ford Motor Company*, 203 F. Supp. 670 (N.D. Ind. 1962).

The federal act specifically provides that it shall not invalidate the provisions of any law of a state except in cases of direct and irreconcilable conflict. 15 U.S.C. § 1225. In light of this tacit approval by Congress, several states have adopted similar statutes regulating automobile franchises. Annot., 7 A.L.R. 3d 1173, 1192 (1966). The courts which have considered these statutes have generally found them constitutional. *Ford Motor Co. v. Pace*, 206 Tenn. 559, 335 S.W. 2d 360, *app. dismissed*, 364

U.S. 444, 5 L.Ed. 2d 192, 81 S.Ct. 235 (1960), *reh. denied*, 364 U.S. 939, 5 L.Ed. 2d 371, 81 S.Ct. 377 (1961); *Louisiana Motor Vehicle Com. v. Wheeling Frenchman*, 235 La. 332, 103 So. 2d 464 (1958); *Kuhl Motor Co. v. Ford Motor Co.*, 270 Wis. 488, 71 N.W. 2d 420 (1955); *Buggs v. Ford Motor Co.*, 113 F. 2d 618 (7th Cir. 1940), *cert. denied*, 311 U.S. 688, 85 L.Ed. 444, 61 S.Ct. 65 (1940); *E. L. Bowen and Co. v. American Motors Sales Corp.*, 153 F. Supp. 42 (E.D. Va. 1957); *Willys Motors v. Northwest Kaiser-Willys*, 142 F. Supp. 469 (D.C. Minn. 1956).

For the reasons previously stated, we find the greater weight of both reason and authority to give added emphasis in this case to the presumption that the judgment of the General Assembly is correct and constitutional. Certainly we cannot say, as we must before declaring the statute unconstitutional, that it so clearly violates the Constitution that no reasonable doubt can arise. *Mitchell v. Financing Authority*, 273 N.C. 137, 159 S.E. 2d 745 (1968).

[3] The plaintiff contends that, even though the statute may be a valid exercise of the police power by the General Assembly, its application in the present case would be retroactive and unconstitutional. In support of this contention, the plaintiff directs our attention to the finding of the trial court that the Mazda Direct Dealer Agreement was dated 1 January 1973. As G.S. 20-305(6) did not become effective until its ratification on 16 March 1973, plaintiff contends its application in the present case would be unconstitutionally retroactive. We do not agree.

Although the written agreement did bear a date of 1 January 1973 and provide that it would be effective from that date through 31 December 1973, the otherwise uncontested evidence of the defendant indicates otherwise. Mr. Jack Carlisle, formerly a principal in the defendant corporation, testified under oath that the agreement was not signed on 1 January as indicated on its face. His testimony was that the document was signed "some months later" and probably not until December of 1973. During oral arguments counsel quite forthrightly indicated to us that the document was not signed on 1 January 1973, but they were unable to recall the exact date on which it was in fact signed. They did indicate, however, that their best recollection was that it was signed after 16 March 1973.

We do not find the date to be crucial in any event. Assuming arguendo that the date of 1 January 1973 set forth on the face of the dealer agreement is correct, we do not feel the application of G.S. 20-305(6) to this contract would be unconstitutional despite the fact that the statute became effective upon its ratification on 16 March 1973. The Supreme Court of the United States has held that regulation of future action based upon rights previously acquired by the person regulated is not prohibited by the Constitution of the United States. *Fleming v. Rhodes*, 331 U.S. 100, 107, 91 L.Ed. 1368, 1373, 67 S.Ct. 1140, 1144 (1947). In another opinion that Court found it inconceivable that the exercise of the commerce power by federal authorities could be hampered or restricted to any extent by contracts previously made between individuals or corporations. *Louisville & Nashville R.R. v. Mottley*, 219 U.S. 467, 482, 55 L.Ed. 297, 303, 31 S.Ct. 265, 270 (1911). We conclude that the same holding should extend to actions by the states under the police power.

It has long been recognized that existing state laws are to be read into contracts in order to fix the obligations of the parties. Additionally, the Supreme Court of the United States specifically held in *Home Building & Loan Association v. Blaisdell*, 290 U.S. 398, 435, 78 L.Ed. 413, 427, 54 S.Ct. 231, 239 (1934):

> Not only are existing laws read into contracts in order to fix obligations as between the parties, but the reservation of essential attributes of sovereign power is also read into contracts as a postulate of the legal order. The policy of protecting contracts against impairment presupposes the maintenance of a government by virtue of which contractual relations are worthwhile,—a government which retains adequate authority to secure the peace and good order of society. This principle of harmonizing the constitutional prohibition with the necessary residuum of state power has had progressive recognition in the decisions of this Court.

This statement by Chief Justice Hughes in *Blaisdell* has in no way been weakened by age. Judicial scrutiny of economic legislation dealing with contracts between private parties has been consistently relaxed since that decision. *The Supreme Court, 1976 Term*, 91 Harv. L. Rev. 1, 89 (1977). We find that G.S. 20-305(6), which requires a filing of notice prior to termination of

automobile franchise contracts, is not made unconstitutional by retroactive application to existing contracts. See *Willys Motors v. Northwest Kaiser-Willys*, 142 F. Supp. 469 (D.C. Minn. 1956). But see, *General Motors Corporation v. Blevins*, 144 F. Supp. 381 (D.C. Colo. 1956). Whether the statute is applied retroactively or prospectively, the test of constitutionality remains whether the core expectations of the contract have been disturbed, and here they have not.

[4] We additionally find that, although Article 12 provides criminal sanctions for violations of G.S. 20-305(6), its application here does not constitute it an ex post facto law prohibited by the Constitution of the United States. U.S. Const. art. I, § 10, cl. 1. That clause applies only in cases in which a crime is created or punishment for a criminal act is increased after the fact and does not speak to the effect of statutes passed after the fact when employed in civil cases. See 3 Strong, N.C. Index 3d, Constitutional Law, § 33, pp. 266-68.

For the reasons previously stated, we find that the General Assembly reasonably concluded that G.S. 20-305(6) promotes the public welfare in an area vitally affecting the general economy of the State. We hold that statute to be constitutional. The trial court's findings and conclusions to the contrary were erroneous and must be reversed.

[5] We turn now to the applicability *vel non* of the statute to the contract presented by this case. The trial court concluded and held that the 10 July 1974 agreement between the parties was a voluntary mutual agreement to terminate their contractual relationship and that notice thereof was not required to be given to the Commissioner of Motor Vehicles pursuant to G.S. 20-305(6). The defendant assigns this as error.

The evidence that the plaintiff did not at anytime comply with the notice requirements of the statute is uncontested. This statute specifically commands that the Commissioner of Motor Vehicles be given the required notice prior to termination or expiration of an automobile dealership franchise. Failure to give the required notice prior to termination or expiration is specifically declared to be unlawful. The voluntariness of such agreements is irrelevant. Apparently it was just such "voluntary agreements", which were in fact contracts of adhesion, that caused this State

and others, as well as the federal government, to enact this and similar regulatory statutes. As failure to give the required notice to the Commissioner was unlawful, the "voluntary agreement" without such notice was contrary to the statutory provisions and, thereby, to public policy. It was therefore illegal and void *ab initio*. 3 Strong, N.C. Index 3d, Contracts, § 6, pp. 374-5. Those portions of the conclusions and order giving effect to the 10 July 1974 agreement were erroneous and must be reversed.

Similarly, the plaintiff's notice to defendant by letter dated 3 June 1974 of the termination of the franchise effective 18 June 1974 did not comply with the notice requirements of the statute. It was, therefore, unlawful and violative of public policy, and we declare it void. See *Cycles, Inc. v. Alexander, Comr. of Motor Vehicles*, 27 N.C. App. 382, 219 S.E. 2d 282 (1975).

[6]   The defendant also assigns as error the ruling of the trial court that the provisions of the direct dealer agreement calling for automatic expiration of the franchise agreement on 31 December 1973 control, and the dealer agreement terminated on that date without notice or action on the part of either party. This assignment is also meritorious.

The statute expressly provides that its terms will predominate over any contrary contractual agreements. We must assume the General Assembly intended what it said in this clear and unambiguous language. *Davis v. Granite Corporation*, 259 N.C. 672, 131 S.E. 2d 335 (1963). To hold otherwise would be to allow the parties to do indirectly that which they cannot lawfully do directly. This would merely encourage the drafting of contracts aimed at frustrating the legislative purpose and lead to unjust or absurd results which we cannot condone. *Cycles, Inc. v. Alexander, Comr. of Motor Vehicles*, 27 N.C. App. 382, 219 S.E. 2d 282 (1975). See, *King v. Baldwin*, 276 N.C. 316, 172 S.E. 2d 12 (1970). As the State itself cannot contract away its police powers or other powers reserved to it by the Constitution of the United States, we see no reason to permit the parties to nullify by contract the State's exercise of those powers. See, *The Supreme Court, 1976 Term*, 91 Harv. L. Rev. 1, 86 n. 25, and cases cited. Those portions of the trial court's conclusion and order holding that the dealer agreement terminated on 31 December 1973 were erroneous and must be reversed.

The defendant contends that the temporary restraining order, preliminary injunction and permanent injunction issued by the trial court and restraining and enjoining the defendant from representing itself to the public as plaintiff's dealer or using the registered trademark "MAZDA" and from otherwise conducting its business in a manner which implies or represents that the defendant is a dealer, was erroneously entered. The defendant further contends that the trial court should have ruled as a matter of law that the franchise agreement was wrongfully terminated, canceled or not renewed by virtue of the plaintiff's failure to comply with the terms of G.S. 20-305(6).

[7] Where, as here, certain provisions of a contract are against public policy and will not be enforced, their invalidity will not invalidate the remaining valid provisions of the contract, if the valid provisions are severable and may be enforced independently of the illegal provision. 3 Strong, N.C. Index 3d, Contracts, § 6, p. 375 and cases cited. We find the remainder of this contract to be easily severable and independently enforceable.

[8] The contract remains a logical whole with only the time for its expiration to be deleted. The time and manner of termination are specifically set by the terms of G.S. 20-305(6). In cases in which proper notice is given the Commissioner and the dealer requests a hearing, the statute specifically provides the franchise shall continue in effect pending his decision. It was unnecessary for the General Assembly to employ this language when referring to situations in which no notice had been given, as the statute specifically declares attempted termination, cancellation or even expiration in such situations to be unlawful and, for reasons previously discussed, void and ineffective. In such situations the franchise continues in effect until the notice requirements of the statute are properly followed. We hold that the trial court erred in failing to rule as a matter of law that the attempts by the plaintiff to terminate the franchise agreement were void as against public policy. We additionally hold that the trial court erred in granting the plaintiff injunctive relief and that the injunction must be dissolved.

Upon the call of this case for trial, the plaintiff tendered to the trial court a motion to amend its complaint to allege, *inter alia*, that First Citizens Bank and Trust Company [hereinafter

"Bank"] had a security interest in all of the Mazda automobile parts located in the inventory of the defendant and that, subject to the security interest of the Bank, defendant was entitled to recover $19,554.31 from the plaintiff. The trial court allowed the motion. After hearing the evidence, the trial court, as a part of its order, granted the relief sought by the amendment and held the defendant, subject to the security interest of the Bank, to be entitled to such recovery.

[9]  The defendant contends this part of the trial court's order was erroneously entered for two reasons. First, it contends there was insufficient evidence to support a finding that the Bank had given value for the security interest pursuant to G.S. 25-9-204(1) and G.S. 25-1-201(37). Second, it contends there was insufficient evidence to support a finding that public notice had been given by the filing of a financing statement so as to perfect the security interest pursuant to G.S. 25-9-302 and G.S. 25-9-401(1)(c).

The plaintiff concedes there was no evidence which would indicate that a financing statement was filed with the Secretary of State. It contends, however, that, whether the Bank's security interest was perfected is of no consequence with regard to the Bank's rights against the defendant. The plaintiff takes the position that the requirement of perfection of such interests is relevant only to third-party priority claims and not to disputes between the secured party and the debtor. We find the plaintiff's contention correct. As stated in Spivack, *Secured Transactions*, 74-85 (3rd Ed. 1963):

> Section 9-201, in substance, provides that the attachment of the security interest is sufficient to create enforceable rights in the secured party with respect to the collateral without anything further being required. It is when the rights of other creditors of the debtor are involved or when the collateral has been transferred to or encumbered by other persons that mere attachment of the security interest may not be sufficient to protect the rights of the secured party. It is for this reason that a distinction is made between the rights of the secured party whose interest has attached and the rights of the secured party whose interest is perfected.

[10]  We find no merit in the defendant's contention that there was insufficient evidence to support a finding that it was given

value by the Bank. Evidence of this prerequisite was introduced in the form of the security agreement between the defendant and the Bank. That security agreement provides:

> 1. SECURITY INTEREST. The collateral provided by this Security Agreement is provided as additional collateral for and in consideration for a loan by First-Citizens Bank and Trust Company to University Garden Apartments, Inc. (which is the sole shareholder of Southwestern Motors, Inc.) in the amount of $110,000.00.

The quoted section of the security agreement was sufficient evidence of the existence of a binding loan commitment constituting value given by the Bank to support the ruling of the trial court. See, Appeal of Copeland, 531 F. 2d 1195 (3d Cir. 1976); White and Summers, *Uniform Commercial Code*, §§ 23-4, at 792-93 (1st ed. 1972) and cases cited. The defendant's assignment of error on this point is overruled.

[11] The trial court erred, however, in finding that the defendant, through Sentry Mazda, a Mazda dealership in Greensboro, North Carolina, owes the plaintiff on account $8,795.09. The plaintiff introduced into evidence a letter from one of its agents to the defendant which was dated 15 August 1974. The letter purported to inform the defendant that, due to termination of Sentry Mazda, parts and tools had been taken to the defendant and partially integrated into its inventory. The letter stated that the plaintiff would transfer the indebtedness for these parts and tools from the account of Sentry Mazda to the account of the defendant. The letter indicated that the plaintiff would credit the Sentry Mazda account and debit a like amount to the defendant's account within the month. The plaintiff also offered evidence that it had never received any response to the letter of 15 August 1974. The plaintiff contends that the defendant was, therefore, liable to it upon an account stated, and that the judgment of the trial court was proper in this regard.

The defendant contends that it cannot be held liable upon the theory of an account stated for a debt incurred by another. See Annot. 6 A.L.R. 2d 113 (1949). Additionally, the defendant directs our attention to a billing introduced into evidence by the plaintiff which indicates that the indebtedness of $8,795.09 was carried on the Sentry Mazda account billings as late as 30 June 1975.

[11, 12] An account is an account stated when a balance is struck and agreed upon as correct. The agreement may be either an express agreement or an agreement implied by failure to object within a reasonable time after the other party has calculated the balance and submitted a statement of the account. 1 Strong, N.C. Index 3d, Accounts, § 2, p. 39. The creditor is only entitled to judgment, however, in the amount stated. Here, the letter of 15 August 1974 stated no specific balance or amount whatsoever. In fact, the exhibits introduced by the plaintiff, indicate that as late as 30 November 1975 the amount claimed had not been debited to the defendant's account.

As the letter on which the plaintiff bases its theory of indebtedness by the defendant upon an account stated did not state a specific amount to be added to the defendant's account and indicated only the manner in which some future balance of the account would be struck, the finding by the trial court that the defendant owed the plaintiff $8,795.09 was erroneous and must be reversed.

For the reasons previously set forth, the judgment appealed from must be reversed in part, affirmed in part and the cause remanded for proceedings consistent with this opinion.

Reversed in part, affirmed in part and remanded.

Judges MORRIS and CLARK concur.