GENERAL MOTORS CORPORATION, PONTIAC MOTOR DIVISION AND OLDSMOBILE DIVISION v. SAMUEL LEE KINLAW D/B/A KNOX OLDS-PONTIAC: R. W. WILKINS, JR., IN HIS OFFICIAL CAPACITY AS COMMISSIONER OF THE DIVISION OF MOTOR VEHICLES; AND ROBERT A. PRUETT, IN HIS OFFICIAL CAPACITY AS HEARING OFFICER FOR THE DIVISION OF MOTOR VEHICLES

No. 8510SC217

(Filed 31 December 1985)

1. **Statutes § 5— later statute clarifying earlier statute—earlier statute controlling**

   Provisions of G.S. 20-305(6) (1983) did not substantively change G.S. 20-305(6) (1978), but merely clarified the original intent, and provisions of the later statute could therefore be considered in determining whether petitioner properly failed to renew its franchise agreement with respondent, though the earlier statute controlled.

2. **Automobiles § 5— franchise agreement—poor sales due to uncontrollable factors**

   Evidence was sufficient to support a determination by the Commissioner of Motor Vehicles that respondent's poor sales performance was primarily due to economic or market factors beyond his control and petitioner's failure to renew its franchise agreements with respondent dealership was therefore without cause where the evidence tended to show that, as a result of rising interest rates, the cost of maintaining a large inventory rose dramatically; one local bank's financing of automobiles, automobile dealers, and automobile agencies dropped off by as much as 40% during the years in question; during the same period, other dealerships in the area significantly reduced their inventories; the county had a high unemployment rate and there were various layoffs and shut-downs; and petitioner's distribution system was partially responsible for respondent's poor sales performance because the system made it impossible for respondent to stock cars in periods of high demand.

3. **Automobiles § 5— franchise—5 year term—improper exercise of authority by Commissioner of Motor Vehicles**

   The Commissioner of Motor Vehicles exceeded his authority in ordering petitioner to enter into a five year motor vehicle dealer sales agreement with respondent. G.S. 20-305(6) (1978).

APPEAL by petitioner from *Preston, Judge*. Order entered 20 November 1984 in Superior Court, WAKE County. Heard in the Court of Appeals 25 September 1985.

By agreements dated 1 June 1980 and 1 November 1980 petitioner granted respondent Samuel Kinlaw (respondent) a two-year franchise for the sale and service of Oldsmobile and Pontiac vehi-

cles. The agreements allowed respondent to operate Knox Olds-Pontiac, a dealership previously operated by his father.

Respondent entered the two-year agreements reluctantly. Having managed the dealership for several years prior to his father's death, he believed he had proven himself capable of operating it successfully and that he thus should have been allowed to enter a standard five-year franchise agreement.

In March 1982 petitioner notified respondent that, due to his dealership's poor sales performance, it was not willing to enter a standard five-year agreement at the expiration of the two-year successor agreements, but instead would extend existing agreements for an additional year. Respondent's sales performance did not improve, however, and as a consequence petitioner notified respondent that existing agreements would not be renewed and by their terms would expire 31 May 1983.

Pursuant to N.C. Gen. Stat. 20-305(6) (1978), respondent requested that the Commissioner of Motor Vehicles conduct a hearing to determine whether good cause existed for petitioner's failure to renew the franchise agreements. Attributing respondent's poor sales performance to prevailing economic conditions and other factors beyond respondent's control, the Commissioner found petitioner's failure to renew to be without cause. Accordingly he ordered, in pertinent part,

> that the Oldsmobile Division and the Pontiac Division of The General Motors Corporation shall not terminate the present motor vehicle dealer sales agreement (franchise) with Samuel L. Kinlaw d/b/a Knox Olds-Pontiac [and]

> that the Oldsmobile Division and the Pontiac Division of General Motors shall enter into a regular five (5) year motor vehicle dealer sales agreement with Samuel L. Kinlaw d/b/a Knox Olds-Pontiac.

Pursuant to N.C. Gen. Stat. 150A-43 *et seq.*, petitioner sought judicial review of the Commissioner's findings and order. From an order of the superior court affirming the Commissioner's order, petitioner appeals.

*Poyner, Geraghty, Hartsfield & Townsend, by Cecil W. Harrison, Jr., for petitioner appellant.*

*Manning, Fulton & Skinner, by Howard E. Manning and Charles E. Nichols, Jr., for respondent appellee.*

WHICHARD, Judge.

Petitioner contends the evidence is not sufficient to support the Commissioner's finding that the failure to renew the franchise agreements was without "good cause." Review of a decision by the Commissioner of Motor Vehicles is governed by N.C. Gen. Stat. 150A-51. *See* N.C. Gen. Stat. 20-300. An agency decision may be reversed or modified if it is "[u]nsupported by substantial evidence . . . in view of the entire record as submitted." N.C. Gen. Stat. 150A-51(5). This standard of review is known as the "whole record" test. *Thompson v. Board of Education,* 292 N.C. 406, 410, 233 S.E. 2d 538, 541 (1977). When, in applying this test, reasonable but conflicting views emerge from the evidence, this Court cannot replace the agency's judgment with its own. It must, however, "take into account whatever in the record fairly detracts from the weight" of the evidence which supports the decision. *Id.* Ultimately it must determine whether the decision has a rational basis in the evidence. *In re Rogers,* 297 N.C. 48, 65, 253 S.E. 2d 912, 922 (1979).

Respondent instituted this proceeding 14 April 1983 by filing a petition pursuant to N.C. Gen. Stat. 20-305 (1978), which provides:

It shall be unlawful for any manufacturer, factory branch, distributor, or distributor branch, or any field representative, officer, agent, or any representative whatsoever of any of them:

(6) Notwithstanding the terms of any franchise agreement to terminate, cancel, or refuse to renew the franchise of any dealer, without good cause, and unless (i) the dealer and the Commissioner have received written notice of the franchisor's intentions at least 60 days prior to the effective date of such termination, cancellation, or the expiration date of the franchise, setting forth the specific grounds for such action, and (ii) the Commissioner has determined, if requested in

writing by the dealer within such 60-day period, and after a hearing on the matter, that there is good cause for the termination, cancellation, or nonrenewal of the franchise . . . provided that in any case where a petition is made to the Commissioner for a determination as to good cause for the termination, cancellation, or nonrenewal of a franchise, the franchise in question shall continue in effect pending the Commissioner's decision . . . .

[1]  Effective 6 August 1983, N.C. Gen. Stat. 20-305(6) was amended. 1983 Sess. Laws ch. 704, sec. 25. Rather than substantively changing the statute, many portions of the amendments merely clarified the original intent. *See* N.C. Gen. Stat. 20-305(6) (1978); N.C. Gen. Stat. 20-305(6) (1983). *See also Childers v. Parker's Inc.*, 274 N.C. 256, 260, 162 S.E. 2d 481, 483 (1968) ("In construing a statute with reference to an amendment it is presumed that the legislature intended either (a) to change the substance of the original act, or (b) to clarify the meaning of it."). Much of N.C. Gen. Stat. 20-305(6) (1978) has not been judicially interpreted and, although the statute as amended does not affect litigation pending at the time of its enactment, 1983 Sess. Laws ch. 704, sec. 25, portions of the amendments are helpful in ascertaining the intent of the legislature in enacting the original version. *See Investors, Inc. v. Berry*, 293 N.C. 688, 695, 239 S.E. 2d 566, 570 (1977) ("In interpreting statutes, the primary duty of this Court is to ascertain and effectuate the intent of the Legislature. [L]ight may be shed upon [that] intent . . . by reference to subsequent amendments which . . . may be interpreted as clarifying it.").

N.C. Gen. Stat. 20-305(6) (1983) reads, in pertinent part,

a. Notwithstanding the terms, provisions or conditions of any franchise or the terms or provisions of any waiver, good cause shall exist for the purposes of a termination, cancellation or nonrenewal when:

1. There is a failure by the new motor vehicle dealer to comply with a provision of the franchise which provision is both reasonable and of material significance to the franchise relationship . . . .

2. If the failure by the new motor vehicle dealer, defined in 1 above, relates to the performance of the new motor

General Motors Corp. v. Kinlaw

vehicle dealer in sales or service, then good cause shall be defined as the failure of the new motor vehicle dealer to comply with reasonable performance criteria established by the manufacturer if the new motor vehicle dealer was apprised by the manufacturer in writing of such failure; and . . . the new motor vehicle dealer's failure was not primarily due to economic or market factors within the dealer's relevant market area which were beyond the dealer's control.

b. The manufacturer shall have the burden of proof under this section.

We find the above provisions indicative of legislative intent in the original enactment of N.C. Gen. Stat. 20-305(6) (1978), and we therefore consider them in analyzing the Commissioner's decision. Thus, to prove that poor sales performance constitutes good cause for its failure to renew respondent's franchise agreements, petitioner must demonstrate that:

1. Respondent failed to comply with a provision of the franchise agreements which required satisfactory sales performance;

2. Petitioner's performance standards are reasonable; and

3. Respondent's failure was not due primarily to economic or market factors beyond his control.

The "Dealer Sales and Service Agreement," which outlines the rights and obligations of petitioner and respondent, provides that respondent "is responsible for: (a) actively and effectively selling . . . new Motor Vehicles to customers of Dealer; and (b) actively and effectively promoting, through Dealer's own advertising and sales promotion activities, the purchase and use of new Motor Vehicles . . . ." Thus, nothing else appearing, respondent's poor sales performance could constitute good cause for petitioner's nonrenewal.

[2] Having reviewed the record as a whole, however, we find substantial evidence to support the Commissioner's determination that petitioner's failure to renew the agreements was without cause. The Commissioner found that during the period in question respondent's sales performance was affected by high interest rates, rising unemployment, and a general economic recession.

Respondent testified that as a result of rising interest rates the cost of maintaining a large inventory rose dramatically. The manager of the sales finance department for Wachovia Bank testified that his department's financing of automobiles, automobile dealers, and automobile agencies dropped off by as much as forty percent during 1980, 1981 and 1982. A salesman for Knox Olds-Pontiac testified that during the same period other dealerships in the area significantly reduced their inventories. The director of Industrial and Agricultural Development for Robeson County testified regarding the county's generally high unemployment rate and various industrial layoffs and shut-downs, all of which could have affected the demand for new automobiles. According to respondent, to remain in business under these economic conditions he had to reduce inventory, cut back on sales staff, and in general "pull back and hold in . . . ."

In addition, the Commissioner determined that petitioner's distribution system was partially responsible for respondent's poor sales performance. Respondent testified that Robeson County is generally an agricultural community; as a result, consumers tend to purchase cars in the fall after having received money for their crops. During the months of August, September and October petitioner distributes its new model cars according to a "controlled distribution" system. The number of cars a dealer receives is based on the number sold by that dealer from January through July. Thus, respondent was unable to stock cars in periods of high demand.

Petitioner maintains that its evidence refutes the proposition that respondent's sales performance was the result of poor economic conditions. Petitioner's evidence establishes that from 1979-82 respondent's sales were below national, regional, and local sales figures, while the sales of two nearby Oldsmobile/Pontiac dealerships, affected by economic conditions similar to those affecting respondent's dealership, were above the same sales standards. In addition petitioner's evidence established that during all relevant periods more Oldsmobiles and Pontiacs were purchased in respondent's area of primary responsibility than were sold by respondents. Thus, according to petitioner, respondent was not fully servicing the demand for Oldsmobiles and Pontiacs within his area of primary responsibility.

Petitioner assesses the performance of its dealerships by comparing an individual dealer's market penetration with national, regional and local levels of market penetration. A dealership's market penetration is determined by dividing the number of cars it sold by the total number of cars sold in its area of primary responsibility. Petitioner's national, regional, and local market penetrations are comparisons between the number of all cars sold in a given market and the number of Oldsmobiles and Pontiacs sold in the same market.

Throughout its dealings with respondent, petitioner maintained that respondent had to achieve a market penetration in its area of primary responsibility equal to national and regional (North and South Carolina) levels. These levels do not necessarily reflect economic conditions affecting an individual dealership. Further, a dealership's performance relative to other dealerships cannot adequately be assessed based on national, regional, and local penetration levels alone. For example, in 1981 Oldsmobile's national market penetration was 9.9, *i.e.*, approximately ten out of every one hundred cars sold nationwide in 1981 were Oldsmobiles. While Oldsmobile's national penetration was 9.9, the market penetration achieved by individual dealerships varied. Petitioner did not present any evidence regarding the number of dealerships below national or regional penetration levels. Assuming an even distribution, in any given year one-half of all petitioner's dealers have market penetration below national and regional levels. Petitioner failed to identify any acceptable level below national and regional levels. The Commissioner thus could find petitioner's standards unreasonable. Petitioner's method of assessing sales performance could enable it to terminate half its franchise agreements. Accordingly, the success of two nearby dealerships in achieving national and regional levels of market penetration, while respondent did not, is not dispositive.

Petitioner asserts that, rather than poor economic conditions, respondent's attitude toward not having received a standard five-year dealership agreement accounted for the dealership's poor sales performance. It points to respondent's testimony:

> Well, then I got a letter notifying me that they were going to extend it for another year, and I called Gary and I told him, I said, Gary, I said, this is not what we discussed. I said,

you promised me that you were either going to terminate me on May 31st of '82 or you were going to give me my normal Five-Year Sales Agreement. *I explained to Gary, I said, if you'll go ahead and do this we can get the show on the road, but just another year's extension is going to be doing it the same way. In other words, we're going to pull back and hold in . . . .*

Respondent repeatedly insisted that he was entitled to a five-year franchise agreement and maintained that if given a five-year agreement he would implement petitioner's requests that he stock more cars, hire more salespersons, and launch a new advertising program. It is clear from respondent's testimony, however, that given the extant economic conditions he did not consider petitioner's requests prudent. He was thus willing to take the risks involved in financially extending himself in a recessionary period only if he had the protection from termination he believed a five-year contract would afford. While in view of N.C. Gen. Stat. 20-305(6) respondent was perhaps mistaken in believing a five-year contract would provide greater protection from termination than his two-year agreements, the Commissioner nonetheless could find that he was not required to implement measures he reasonably considered improvident under the circumstances.

Petitioner contends the Commissioner was influenced by arbitrary and capricious factors. An agency decision infected by consideration of arbitrary and capricious matters which substantially affect a party's rights violates N.C. Gen. Stat. 150A-51(6) and cannot be affirmed. *A&T University v. Kimber*, 49 N.C. App. 46, 51-52, 270 S.E. 2d 492, 495 (1980).

The Commissioner made numerous findings of fact regarding the sales performance of Knox Olds-Pontiac during the period 1976-79. Petitioner maintains that these findings are not relevant to a determination of whether good cause for terminating respondent's franchise existed, since respondent did not enter into the franchise agreements until June and November of 1980. However, petitioner presented testimony which established that a dealer's supply of new cars is based on sales made by that dealership in the preceding year. Thus, the Commissioner could examine the number of cars ordered by, delivered to, and sold by Knox Olds-Pontiac prior to respondent's franchise agreement to

General Motors Corp. v. Kinlaw

determine the extent to which respondent's poor sales perform-
ance was a function of factors beyond respondent's control.

In addition petitioner maintains the Commissioner's deter-
mination is infected by his unsupported findings that petitioner
"insisted" and "demanded" that respondent take certain steps to
improve sales performance. Petitioner admits that its agents re-
peatedly *"recommended"* that respondent increase inventory, em-
ploy more salespersons, and launch a new advertising program.
Petitioner's Charlotte zone manager testified that respondent's
failure to implement the above recommendations was a primary
factor in the decision to terminate respondent's franchise agree-
ments. We find that the Commissioner's choice of words to state
his findings is supported by substantial evidence in the record.

Petitioner also objects to the Commissioner's finding that it
"began planning to terminate the Knox Olds-Pontiac dealership as
early as February 1981." The finding, however, is supported by
substantial evidence. By letter dated 12 February 1981 the follow-
ing information was circulated among petitioner's management
personnel:

> The Interim Selling Agreement for the above dealer [re-
> spondent] expires on May 31, 1982. It is important that we
> maintain a record of routine contacts with Sam Kinlaw show-
> ing that we have covered the sales and registration require-
> ments for Oldsmobile with him.
>
> We should also recite any agreement or lack of agreement
> which he would or would not cooperate with. Of course, in-
> clude in your report his agreement or refusal to order ade-
> quate cars for his market.

In addition, a salesman for respondent testified that early in 1981
petitioner's district manager told him petitioner was trying to
find someone to take over the dealership.

For the foregoing reasons, we hold the superior court's af-
firmance of the Commissioner's order proper insofar as that order
found petitioner to have failed to renew respondent's franchise
agreements without cause and directed that the agreements not
be terminated.

[3] Petitioner next contends the Commissioner exceeded his authority in ordering it to enter "a regular five (5) year motor vehicle dealer sales agreement" with respondent. We agree. The Commissioner has "only such authority as is properly conferred upon [him] by the Legislature." *Insurance Co. v. Gold, Commissioner of Insurance*, 254 N.C. 168, 173, 118 S.E. 2d 792, 796 (1961); *Insurance Co. v. Lanier, Comr. of Insurance*, 16 N.C. App. 381, 384, 192 S.E. 2d 57, 58-59 (1972). In addition to the powers expressly vested in an agency by statute, those powers reasonably necessary for the agency to function properly are implied from the legislature's general grant of authority. *In re Community Association*, 300 N.C. 267, 280, 266 S.E. 2d 645, 654-55 (1980); *Insurance Co.*, 16 N.C. App. at 384, 192 S.E. 2d at 58.

Neither N.C. Gen. Stat. 20-301 (1978), which delineates the powers of the Commissioner, nor N.C. Gen. Stat. 20-305(6) (1978), pursuant to which this proceeding was initiated, expressly vests the Commissioner with the power to order parties to enter into a contract. Further, the proper functioning of the Department of Motor Vehicles under Article 12 of the General Statutes, "Motor Vehicle Dealers and Manufacturers Licensing Law," does not require that the Commissioner hold such power. N.C. Gen. Stat. 20-305(6) requires the Commissioner, upon a dealer's request, to determine whether there is "good cause" for a franchisor's nonrenewal of a dealership agreement. Once the Commissioner determines that good cause does not exist, the franchisor's attempts to terminate relations with the dealership are in violation of Article 12 and the Commissioner may seek to enjoin the franchisor's actions by initiating a proceeding pursuant to N.C. Gen. Stat. 20-301(d). Thus, the franchise continues in effect until termination for good cause is effected pursuant to N.C. Gen. Stat. 20-305(6) (1983) or until both parties consent to cancellation. The statutory prohibition on franchise termination except for cause remains intact. *See* Note, *Adjusting the Equities in Franchise Termination: A Sui Generis Approach*, 30 Clev. St. L. Rev. 523, 547 (1981). It is not necessary that the Commissioner have the power to order parties to enter into contracts to enable the agency to function properly.

A similar result was reached in *Mazda Motors v. Southwestern Motors*, 36 N.C. App. 1, 15, 243 S.E. 2d 793, 803 (1978), *modified in part on other grounds*, 296 N.C. 357, 250 S.E. 2d 250 (1979).

There this Court found that the notice requirements for termination pursuant to N.C. Gen. Stat. 20-305(6) had not been met. As a result the franchise agreement was held to remain in effect until notice was perfected.

In ordering the parties to enter a five-year contract the Commissioner exceeded the authority vested in him by the General Assembly. Accordingly, the superior court should have vacated that portion of the Commissioner's order. The franchise agreements continue in effect until petitioner makes a proper termination pursuant to N.C. Gen. Stat. 20-305(6) (1983) or until the parties mutually agree to terminate. Petitioner may again seek to terminate the agreements by complying with the notice provisions of N.C. Gen. Stat. 20-305(6) (1983).

The order of the superior court, except for its affirmance of those portions of the Commissioner's order requiring petitioner to enter "a regular five (5) year motor vehicle dealer sales agreement" with respondent, is affirmed. Insofar as the order affirms the portions of the Commissioner's order requiring petitioner to enter "a regular five (5) year motor vehicle dealer sales agreement" with respondent, it is reversed, and the cause is remanded with instructions to modify the order by vacating those portions.

Affirmed in part, reversed in part, and remanded.

Judges EAGLES and COZORT concur.