**DUNNE LEASES CARS & TRUCKS, INC.**

v.

**KENWORTH TRUCK COMPANY, a DIVISION OF PACCAR, INC.**

No. 80–493–Appeal.

Supreme Court of Rhode Island.

Oct. 13, 1983.

**1154**

Abraham Belilove, Arcaro, Belilove & Kolodney, Providence, for plaintiff.

Richard M. Borod, Edwards & Angell, John D. Deacon, Jr., Edwards & Angell, Providence, for defendant.

OPINION

SHEA, Justice.

This case is before us on appeal by the plaintiff from a judgment entered in the Superior Court denying injunctive relief. We affirm.

The case was heard by a justice of the Superior Court sitting without a jury. The evidence established that beginning in 1970, plaintiff, Dunne Leases Cars & Trucks, Inc. (Dunne), a Rhode Island corporation, and defendant, Kenworth Truck Company, a division of Paccar, Inc. (Kenworth), a foreign corporation, entered into several successive

dealership agreements whereby plaintiff was authorized to sell and service heavy-duty truck-tractors and to sell parts manufactured by Kenworth. Two such agreements are of particular interest in this case. One is an agreement effective for three years beginning November 1, 1976, with John M. Dunne, Sr. (Dunne, Senior) as principal. The second is an agreement effective for one year from October 4, 1978 with John M. Dunne, Jr. (Dunne, Junior) as principal.

In 1977, during the term of the three-year agreement, Dunne, Senior, died. Kenworth, relying on the provision that the agreement was one for personal services (as the written contract specifically stated), requested that Dunne, Junior, and Kenworth enter into a new contract. There were two major differences between the new agreement and those that preceded it. First, the new agreement provided for a one-year term instead of a three-year term. The one-year agreement expressly stipulated that the Dunne Motor Vehicle Leasing operation be separated and removed from the Kenworth dealership within six months of the October 4, 1978 date of execution of the agreement. Both business activities, Dunne Leasing and Kenworth, were housed at the time in the same leased facility at 895 Elmwood Avenue, Providence, Rhode Island. Evidence was presented that the facility was crowded, inefficient, cluttered and dirty and lacked lounge facilities and adequate parking space for Kenworth's customers. The Kenworth people wanted space for a display of their goods and merchandise as well as parking and other amenities for their customers and a more attractive, less cluttered facility for Kenworth activities.

The removal or separation of the leasing operation from the Kenworth activity was never accomplished. By letter dated September 28, 1979, Dunne was notified that its agreement with Kenworth, which was to

expire October 4, 1979, would not be renewed and that the relationship between the two concerns would be terminated as of December 4, 1979.

Dunne sought injunctive relief, alleging that Kenworth's notice of nonrenewal was invalid; that certain conduct by Kenworth during the negotiations of the one-year agreement was coercive; and that the decision not to renew was without due cause, all in violation of G.L.1956 (1979 Reenactment) § 31–5.1–1.[1]

Dunne obtained a temporary restraining order preventing the termination of business relations until the matter was heard on the merits. After a prolonged trial in Superior Court, the trial justice denied relief. He found that the notice of nonrenewal was valid, that the allegations of coercion were without merit, and that due cause existed for Kenworth's decision not to renew. We affirm.

I

*Legal Notice of Nonrenewal*

The first issue we must consider concerns the notice given by Kenworth of its decision not to renew.

The agreement at issue provided for a term of one year that would terminate October 4, 1979. The notice of nonrenewal was given by letter dated September 28, 1979, which the parties agree was received by Dunne on October 2, 1979. The letter set forth that the dealership agreement that would expire on October 4, 1979, would not be renewed and provided further:

"In order to provide for an orderly phase out of our business relationship, we will continue to operate under the provisions of that agreement until December 4, 1979."

Dunne contends that to be valid and effective under § 31–5.1, the notice of nonre-

---

1. For text of G.L.1956 (1979 Reenactment) §§ 31–5.1–1 to 31–5.1–17, see appendix. Chapter 5.1 of title 31 has been subsequently amended by P.L.1981, ch. 346, and is now codi-

fied as G.L.1956 (1982 Reenactment) §§ 31–5.-1–1 to 31–5.1–20. All section numbers in this opinion refer to the 1979 Reenactment.

newal must have been forwarded no later than sixty days before the expiration date of the agreement in question. The operative language of the statute with respect to nonrenewal provides that the dealer shall be notified in writing

> "at least sixty (60) days before the contractual term of his franchise or selling agreement expires * * * and in no event shall the contractual term * * * expire * * * prior to the expiration of at least sixty (60) days following such written notice." Section 31–5.1–4(C)(3).

We note that the statute does not require that notice be given at least sixty days in advance of the expressed expiration date of the agreement, which is the position Dunne advocates. The notice requirements of the statute, in our opinion, were intended to give a dealer sixty days' notice before the conclusion of his dealership, whether the conclusion came about by termination or cancellation of the agreement or the nonrenewal of the agreement, as in the case before us.

 Dunne has not provided us with any authority for its interpretation of the statute, nor have we found any. Our paramount task in construing a statute is to ascertain the intent behind its enactment and to effectuate that intent whenever it is lawful and within the competence of the Legislature. *Kingsley v. Miller,* 120 R.I. 372, 388 A.2d 357 (1978). In order to ascertain the legislative intent, we examine the language, nature, and object of the statute. *Berthiaume v. School Committee of Woonsocket,* 121 R.I. 243, 397 A.2d 889 (1979); *Nolan v. Representative Council of Newport,* 73 R.I. 498, 57 A.2d 730 (1948). In the construing of a statute, it is also permissible to consider the reasonableness of the result of a particular interpretation. *Raymond Construction Co. v. Bisbano,* 114 R.I. 1, 326 A.2d 858 (1974); *Braman v. Wawaloam Reservation, Inc.,* 107 R.I. 270, 267 A.2d 410 (1970).

In § 31–5.1–4(C)(3), the first reference to sixty days relates to termination or cancellation, but not to renewals. The second reference provides for separate statutory notice requirements in the event of a nonrenewal, which this case involves. The notice for nonrenewal differs from that involved in termination or cancellation:

> "Such manufacturer * * * shall notify a motor vehicle dealer in writing * * * at least sixty (60) days before the contractual term of his * * * selling agreement expires that the same shall not be renewed * * * and in no event shall the contractual term of any such franchise or selling agreement expire * * * prior to the expiration of at least sixty (60) days following such written notice." Section 31–5.1–4(C)(3).

The trial justice held that the statutory language permits two interpretations. One interpretation is that the notice and the sixty-day period must be received and occur before the stated expiration date of the agreement. The second is that the notice of nonrenewal must be received before the expiration date of the agreement with some portion of the sixty-day period commencing before and the remainder running after the expiration date in the agreement. We believe a third interpretation achieves a more reasonable result and accomplishes the legislative intent.

The first interpretation, which is Dunne's position, gives rise to a question of what the obligations of the parties are if the notice of nonrenewal is not given at all within the period covered by the agreement. This interpretation would require continuing the relationship indefinitely, long after the agreement had expired in accordance with its own terms. This would be so even though, as is the case before us, the agreement is silent on the matter of renewal or extension. To deny the manufacturer, with due cause, the right not to renew after giving sixty days' notice is not a reasonable result, nor in our opinion is it a necessary one. We believe that a manufacturer who has given advance notice of sixty days and can establish that its action is not arbitrary but is based on due cause should have the right not to renew.

We agree with the result reached in a decision rendered in the Federal District Court in New Hampshire in a case that examines language in a dealership contract identical to the language before us. *Russ Thompson Motors, Inc. v. Chrysler Corp.,* 425 F.Supp. 1218, 1220 (D.N.H.1977). In that case the manufacturer and the dealer had entered into a one-year agreement that ran from March 31, 1975, to March 31, 1976. It was not renewed, but the relationship continued. Then in July 1976, a sixty-day termination notice was given, and the dealer sought to prevent cancellation by seeking injunctive relief. The court stated:

"The type of selling agreement we have here cannot be terminated unless the manufacturer gives written notice to the dealer at least sixty days before its expiration date. This was not done. The Term Sales Agreement, therefore, was not 'terminated automatically' on [the expiration date]. *The statute operated to extend the agreement indefinitely.*

When there is no definite contractual period [such as the case before us where the sixty (60) day notice period would extend well beyond the term of the contract] or when a contract is to be terminated before the end of a definite term, the statute requires that a manufacturer notify a dealer in writing of the termination or cancellation 'at least sixty days before the effective date thereof, stating the specific grounds for such termination or cancellation.' " (Emphasis added.) *Id.* at 1220.

 Under the statute, the manufacturer could not terminate or refuse to renew the agreement without sixty days' notice. The statute, in our opinion, extends the agreement by whatever period is necessary to accommodate the sixty-day notice

requirement. Written notice of termination, cancellation, or nonrenewal, based on due cause, will be effective and valid if it complies with the sixty-day requirement. The notice here complied with our reading of the statute.

## II

### *Due Cause*

The statute before us prohibits termination or nonrenewal of a dealer's agreement without "due cause."[2] Unfortunately, the Legislature did not define that term, and we therefore must determine the meaning of the phrase and then decide whether or not due cause existed. In the absence of clear guidance within the statute, we look to other sources. Some of the other jurisdictions that have enacted the regulatory statutes similar to ours have defined due cause. Most who have done so provide that the existence and materiality of any breach, default, or violation of the agreement by the dealer is sufficient due cause to terminate the relationship when considered with any other pertinent circumstances.[3]

Our own state has enacted the Motor Fuel Distribution and Sales Act, G.L.1956 (1976 Reenactment) chapter 55 of title 5, as assigned by P.L.1976, ch. 324, § 1, which regulates franchise agreements between oil companies and service-station owners, a purpose akin to that of the statute before us. In that statute, the Legislature prohibited termination of an agreement except for due cause. That statute provides that among several acts that would constitute due cause was "[s]ubstantial noncompliance with the obligations of the franchise agreement." Section 5–55–4(3)(J).

**2.** General Laws 1956 (1979 Reenactment) § 31–5.1–9, repealed by P.L.1981, ch. 346, § 2, used the term "due cause" and applied it at the time of this case. The new law concerning franchise renewal is codified at G.L.1956 (1982 Reenactment) § 31–5.1–4(D) (as amended by P.L.1981, ch. 346, § 1) and refers to "good cause." For purposes of consistency, this court will use "due cause."

**3.** Ariz.Rev.Stat.Ann. § 28–1304.02(M) (1982); Conn.Gen.Stat.Ann. § 42–133f(a) (1978); Neb. Rev.Stat. §§ 60–1420 and 60–1433 (1943); Wash.Rev.Code Ann. § 19.100.180(J) (1978); Wis.Stat.Ann. § 135.02–03 (1974); Petroleum Marketing Practices Act 15 U.S.C.A. § 2802(b)(2)–(3) (1982).

The Massachusetts Motor Vehicle Dealer Statute to which the trial justice referred provides that a dealer's material breach of an obligation is one important factor to be considered together with all other "pertinent circumstances" in determining the existence of due cause. Mass.Ann.Laws, ch. 93B, § 4(4)(vii) (Michie/Law. Coop.1972).

Those states whose Legislatures have attempted to define the term "just cause" or "good cause" or "due cause" within the context of justification for nonrenewal of a franchise or dealership agreement have all agreed that such causes include substantial noncompliance with obligations in the agreement. Furthermore, those courts that have applied statutes that do not contain a definition of the cause sufficient to justify nonrenewal of a franchise agree quite uniformly with the statutory definitions. *See Russ Thompson Motors, Inc. v. Chrysler Corp.,* 425 F.Supp. 1218 (D.N.H.1977), which applied a New Hampshire statute identical to ours and concluded that an automobile dealer's failure to comply with a provision of a dealership agreement created due cause for nonrenewal.

■ The purpose for this kind of regulatory legislation is remedial; that is, it is designed primarily to prevent arbitrary termination on the part of a manufacturer at the expense of a dealer and also to prevent harm to the general public. Some writers and commentators have variously described motor-vehicle franchise agreements as economic "death sentences" (Kessler, *Automobile Dealer Franchises: Vertical Integration By Contract,* 66 Yale L.J. 1135 (1957)) and "unilateral contracts [with] terms dictated by the manufacturers" (*Mazda Motors of America, Inc. v. Southwestern Motors, Inc.,* 36 N.C.App. 1, 7, 243 S.E.2d 793, 798 (1978), *modified,* 296 N.C. 357, 250 S.E.2d 250 (1979)). Franchise-protection statutes are intended to rectify "grossly disproportionate bargaining power." *Westfield Centre Service, Inc. v. Cities Service Oil Co.,* 158 N.J.Super. 455, 475, 386 A.2d 448, 459 (1978). The ability to exercise power and to exert economic pressure in a legally permissible fashion depends on the circumstances of each case. *American Motors Sales Corp. vs. Semke,* 384 F.2d 192, 197–98 (10th Cir. 1967).

The evidence in the record establishes that the necessity for and desirability of separation of Dunne's leasing business from the Kenworth dealership was accepted by Dunne, its principals, and Kenworth as far back as 1976. There is evidence that the leasing operation adversely impacted on the dealership in the areas of parking, cleanliness, parts sales, and service. Evidence in the form of photographs supporting the testimony about conditions at Dunne and the appearance of cleanliness and order in Kenworth dealerships in other locations illustrates quite graphically the changes Kenworth sought. Also, the division of employees' responsibilities resulting from the continued use of the one facility for both businesses was not acceptable to Kenworth. In October of 1976, Dunne, Senior, agreed that the facility was physically inadequate to house the leasing operation as well as the parts-sales and servicing requirements of the dealership. Dunne's general manager at that time indicated a desire to make the move within a year, and Kenworth requested that the desire be converted to a written action plan with a precise time table. This mutual acknowledgement of the problem occurred during a time when Dunne was meeting all of its sales quotas for 1976. In February of 1977, because the situation had not changed, Kenworth requested a written commitment and a plan for improvement by July 1977. By that date, however, Dunne had not responded, and Kenworth renewed its request for a written plan covering Dunne's future intentions for the facility. Nothing had happened by September of 1977, although Dunne still agreed that the move was necessary. A meeting proposed to discuss the move that was to occur in October of 1977 was not held because of Dunne, Senior's death.

In February of 1978 Kenworth requested a written proposal from Dunne, Junior, for a new dealership agreement. That proposal

was submitted in July 1978. Kenworth then raised the mutual acknowledgment of the fact that the facility had reached the saturation point and that the leasing operation had to be removed. Kenworth asked that the commitment to move be written into the new agreement. By letter dated July 31, 1978, Dunne, Junior, committed himself to removal of the leasing operation by January 31, 1979; however, on October 4, 1978, the parties entered into a new dealership agreement that, by its terms, extended Dunne's commitment to remove the leasing operation to April 4, 1979.

During a visit at Dunne's by Kenworth personnel on December 12 and 13, 1978, and by means of a letter dated January 12, 1979, Kenworth again reminded Dunne of the commitment to remove the leasing operation. Visits by Kenworth representatives to Dunne's facility in February and April of 1979 revealed that Dunne had apparently taken no action to perform on the agreement. On June 14 and 15 during another visit by Kenworth personnel and later by means of a letter of June 28, 1979, Kenworth again related its position to Dunne, reminding it of the earlier commitment and placing them on notice that it was in violation of the existing agreement. Dunne was specifically advised that unless the change was made in time to run the full cycle of any subsequent agreement, there would be no renewal. By letter of August 15, 1979, Dunne acknowledged that the removal had not yet been accomplished but would assuredly be completed by August 31, 1979. This did not occur. A later visit in September 1979 by Kenworth personnel disclosed no apparent action to remove the leasing operation.

During trial, Dunne's witnesses never denied that the removal of the facility was desirable, that it would improve the Kenworth operation in general and increase its potential or that it would permit more parking, better housekeeping, and less congestion.

A review of the record makes it abundantly clear that after Dunne failed to re-move the leasing operation within the contractual time, Kenworth placed Dunne on notice that there would be no renewal unless the removal was completed in time to run the full cycle of the new agreement. Dunne promised thereafter to complete the removal by August 15 and later by August 30, but failed to do so. There is no question that its failure to comply constituted a material breach of the contract. Dunne, Junior, conceded that he had misjudged the importance that Kenworth was placing on removal. In view of the clear language of Kenworth's notice and warnings, the miscalculation is very difficult to justify.

Dunne contends that as long as its sales quotas were met, it cannot be found to have materially breached the agreement. To pursue this argument to its logical conclusion, one would have to agree that Dunne's maintenance of its sales quotas could justify its disregard of any other aspect of the agreement.

Numerous cases have held that the meeting of sales quotas will not justify nonperformance of other material contractual obligations. *Excello Wine Co. v. Monsieur Henry Wines, Ltd.,* 474 F.Supp. 203 (S.D. Ohio 1979); *Sundown Imports, Inc. v. Arizona Department of Transportation,* 115 Ariz. 428, 565 P.2d 1289 (Ct.App.1977); *Nagle Motors, Inc. v. Volkswagen North Central Distributors, Inc.,* 51 Wis.2d 413, 187 N.W.2d 374 (1971). In fact, in *Amoco Oil Co. v. Dickson,* 378 Mass. 44, 389 N.E.2d 406 (1979), it was held that a dealer's performance of all contractual obligations does not preclude existence of due cause for termination. In that case, all contractual obligations were being met and a profit was being realized. The manufacturer, however, made a good-faith decision that the service station was not profitable enough to continue the operation. The court concluded that the manufacturer's termination was justified.

In the case before us, in addition to finding a material breach, the trial justice also found that failure to remove the leasing operation, considered with all other perti-

nent circumstances, established due cause for nonrenewal. Those other pertinent circumstances included the fact that plaintiff's "facility was inadequate and fell far short of Kenworth's requirements and expectations." The trial justice found further that the nonrenewal of Dunne's franchise would have little, if any, adverse effect on the public since the market area is small and similar agencies located in nearby states could service the needs of the public in the Rhode Island area. It is also interesting to note that the trial justice found Dunne's investment to be minimal, that it was incurred in part for its leasing enterprise housed in the same facility, and that its capital investment was not permanent since the physical structure was leased. Although Dunne challenges this latter finding and asserts that Dunne's investment in Kenworth was approximately $1,300,000, evidence exists to establish that $1,264,000 of that investment was inventory. Stock inventory is not the type of capital investment that is relevant to a consideration of causes for nonrenewal. The evidence that the trial justice apparently found credible would indicate that the capital investment by Dunne having a bearing on these issues was more in the neighborhood of $40,000 for the entire period of Dunne's relationship with Kenworth.

■ After review of the record, we conclude that Kenworth offered Dunne ample opportunity to comply with all provisions of the agreement. We conclude further, as did the trial justice, that the failure to comply, in and of itself, constituted just cause for nonrenewal as provided by the statute. At no time does Dunne assert that it did not breach its contractual commitment to separate the leasing activities from the Kenworth dealership. Dunne argues, however, that it was error for the trial justice to find that breach a material one.

■ The materiality of a breach of contract is essentially a factual question. The resolution of such a factual issue requires consideration of all of the pertinent evidence and the conduct and relationship of the parties. *DiMario v. Heeks*, 116 R.I. 44,

351 A.2d 837 (1976); *Ferris v. Mann*, 99 R.I. 630, 210 A.2d 121 (1965). The finding of a trial justice sitting without a jury is entitled to great weight and will not be disturbed unless he overlooked or misconceived material evidence or was clearly wrong. *See, e.g., Ferris v. Hawkins*, R.I., 457 A.2d 253, 255 (1983); *Altieri v. Dolan*, R.I., 423 A.2d 482, 484 (1980); *Taffinder v. Thomas*, 119 R.I. 545, 549, 381 A.2d 519, 521 (1977); *see* 1 Kent, *R.I.Civ.Prac.* § 52.5 at 384 (1969). Our review of the record persuades us that the trial justice was justified in finding that the breach in this case was a material one.

### III

#### *Coercion*

Dunne next contends that Kenworth's conduct during the period of negotiations prior to the one-year agreement violated § 31–5.1–4(C)(2). That subsection provides that it shall be deemed a violation of the chapter:

> "To coerce or attempt to coerce, any motor vehicle dealer to enter into any agreement with such manufacturer * * * or to do any other act prejudicial to said dealer by threatening to cancel any franchise or any contractual agreement existing between such manufacturer * * * provided, however, that notice in good faith to any * * * dealer of said dealer's violation of any terms or provisions of such franchise or contractual agreement shall not constitute a violation of this chapter."

For the purposes of our consideration, we define coercion as " 'a wrongful demand which will result in sanctions if not complied with.' " *Marquis v. Chrysler Corp.*, 577 F.2d 624, 633 (9th Cir.1978) (quoting *Fray Chevrolet Sales, Inc. v. General Motors Corp.*, 536 F.2d 683, 685 (6th Cir.1976)). Even though Dunne's refusal might have given rise to sanctions, there is no evidence whatsoever that Kenworth's demands were wrongful.

■ The last agreement entered into with Dunne, Senior, specified that it was a personal-services contract that Kenworth

entered into in reliance on Dunne, Senior's personal qualifications and the financial conditions of named persons, including Dunne, Senior. The agreement also provided for termination by Kenworth on any change in the principal, ownership, or active management of the distributorship. The statute recognizes the manufacturer's right to rely on the personal qualifications of a specific individual. Sections 31–5.1–4(C)(7) and (8) provide that it is a violation of the chapter:

"7. To prevent or attempt to prevent by contract or otherwise any motor vehicle dealer from changing the capital structure of his dealership or the means by which * * * he finances * * * his dealership * * * *and provided such change by the dealer does not result in a change in the executive management control of the dealership.*

"8. To prevent or attempt by contract or otherwise any motor vehicle dealer * * * from selling or transferring any part of the interest of any * * * stockholder of any * * * dealer * * * provided, *however, that no dealer * * * shall have the right to sell, transfer or assign the franchise or power of management or control. thereunder without the consent of the manufacturer * * * except that such consent shall not be unreasonably withheld."* (Emphasis added.)

These policies enunciated in the statute and the specific provisions in the contract with Dunne, Senior, justify Kenworth's request that Dunne, Junior, enter into a new and separate agreement after Dunne, Senior's death.

■ The record reflects that this new agreement was not hastily thrust upon Dunne. The request for it was made by letter dated February 21, 1978, about three months after Dunne, Senior, had died. The agreement itself was not finalized and executed until October 4, 1978. During the interim, Dunne, Junior, was allowed to continue the relationship set up in the old agreement. The final agreement is the same in all particulars with those that preceded it except for the one-year contract term and the commitment to move the leasing operation.

Our review of the record fails to disclose any basis for the claim of coercion in regard to any particular provision in the one-year agreement. Although Dunne, Junior, asserted that he signed the agreement without consulting counsel, there was some evidence to the contrary. Correspondence and memoranda from Kenworth appear to have notations thereon by Dunne, Junior's attorney, apparently made before the agreement was executed. When questioned about why he signed the agreement, Dunne, Junior, stated that it was a business judgment on his part to do so.

The evidence also establishes that long before the time the agreement with Dunne, Junior, was being negotiated, the separation of the leasing operations from the dealership had become important and necessary. Mr. Beaudoin, Dunne's manager of Kenworth's operation, and Dunne, Junior, himself agreed that removal of the leasing operation was desirable. None alleges that these admissions were coerced in any way.

In the absence of clear evidence establishing coercion, it is difficult to infer coercion from the actions of a manufacturer requiring a dealer to do something that all parties in interest agree would be beneficial and would make future growth more probable. The evidence tends to establish a situation not of coercion but one in which a manufacturer was insisting on a physical change for the better and a distributor was agreeing that the change was desirable. After agreeing to make the change, the dealer did not do so. Dunne argues that because Kenworth's position for bargaining was much stronger, Dunne's agreement was coerced. This simply does not follow. We believe the trial justice was correct in finding a failure of proof of coercion on Kenworth's part.

### IV

#### *Unconscionability*

■ Dunne asserts that Kenworth's actions violated § 31–5.1–4(A), which provides:

"(A) It shall be deemed a violation of this chapter for any manufacturer * * * to engage in any action which is arbitrary, in bad faith, or unconscionable and which causes damage to any of said parties * * *."

Dunne argues that Kenworth's refusal to give an additional grace period, which Dunne requested following receipt of the nonrenewal letter, was arbitrary, in bad faith, and was unconscionable. We need not spend a great deal of time on this particular point. In our discussion of the other issues, we have considered the parties' recognition of the need for removal as early as 1976 and Dunne's inaction in the face of repeated reassertions by Kenworth of its desire for the change. Other than one actual but unsuccessful attempt to acquire other space for the leasing operation, Dunne failed to accomplish the move even after it had contracted to do so.

What is clear from the record is that Dunne, Junior, never really believed Kenworth would not renew. He completely misread Kenworth's clear warnings and was apparently in error in his appraisal of Dunne's status in relation to Kenworth. In the face of this miscalculation, there is no basis for the argument that Kenworth should have given Dunne, or that Dunne had a right to expect, an additional grace period beyond the sixty days required by the statute.

Dunne next argues that the failure of the dealer agreement to provide for compensation to Dunne for nonrenewal and also the lack of a requirement that Kenworth buy back Dunne's inventory are unconscionable and in violation of the statute.

 The statute requires the manufacturer to compensate the dealer only when the cancellation or nonrenewal is undertaken without due cause. Section 31–5.1–9. Since we agree with the trial justice that there was due cause for nonrenewal, there is no compensation or buy-back obligation imposed by the statute. Buy-back obligations, if any, would arise then from the provisions of the agreement. In comparing the agreement in question with those that covered the period of Kenworth's dealings with Dunne, Senior, from November 1973 until Dunne, Senior's death in 1978, the obligations to repurchase on cancellation, termination, or nonrenewal appear to be virtually identical. No new provision or penalty was imposed against Dunne, Junior. Dunne has argued, but failed to establish, any violation of the statute prohibiting arbitrariness, unconscionability, or bad faith on the part of Kenworth.

For the reasons given, Dunne's appeal is denied and dismissed, the judgment appealed from is affirmed, and the papers in the case are remanded to the Superior Court for further proceedings.

### APPENDIX

General Laws 1956 (1979 Reenactment):

### CHAPTER 5.1

### REGULATION OF BUSINESS PRACTICES AMONG MOTOR VEHICLE MANUFACTURERS, DISTRIBUTORS AND DEALERS

"31–5.1–4. Violations.—A. It shall be deemed a violation of this chapter for any manufacturer, factory branch, factory representative, distributor or wholesaler, distributor branch, distributor representative or motor vehicle dealer to engage in any action which is arbitrary, in bad faith, or unconscionable and which causes damage to any of said parties or to the public.

\* \* \*

C. It shall be deemed a violation of this chapter for a manufacturer, a distributor, a wholesaler, a distributor branch or division, a factory branch or division, or a wholesale branch or division, or officer, agent or other representative thereof:

\* \* \*

2. To coerce, or attempt to coerce, any motor vehicle dealer to enter into any agreement with such manufacturer, distributor, wholesaler, distributor branch or division, factory branch or division, or wholesale branch or division, or officer, agent or other representative thereof, or to do any other act prejudicial to said dealer by threatening to cancel any franchise or any

contractual agreement existing between such manufacturer, distributor, wholesaler, distributor branch or division, factory branch or division, or wholesale branch or division, and said dealer; provided, however, that notice in good faih to any motor vehicle dealer of said dealer's violation of any terms or provisions of such franchise or contractual agreement shall not constitute a violation of this chapter.

3. To terminate or cancel the franchise or selling agreement of any such dealer without due cause. The nonrenewal of a franchise or selling agreement without due cause, shall constitute an unfair termination [or] cancellation, regardless of the terms or provisions of such franchise or selling agreement. Such manufacturer, distributor, wholesaler, distributor branch or division, factory branch or division, or wholesale branch or division, or officer, agent or other representative thereof shall notify a motor vehicle dealer in writing, and forward a copy of such notice to the registrar of motor vehicles, of the termination or cancellation of the franchise or selling agreement of such dealer at least sixty (60) days before the effective date thereof, stating the specific grounds for such termination or cancellation; and such manufacturer, distributor, wholesaler, distributor branch or division, factory branch or division, or wholesale branch or division, or officer, agent or other representative thereof shall notify a motor vehicle dealer in writing, and forward a copy of such notice to the registrar of motor vehicles at least sixty (60) days before the contractual term of his franchise or selling agreement expires that the same will not be renewed, stating the specific grounds for such nonrenewal in those cases where there is no intention to renew the same, and in no event shall the contractual term of any such franchise or selling agreement expire, without the written consent of the motor vehicle dealer involved, prior to the expiration of at least sixty (60) days following such written notice. In the event dealer is no longer regularly doing business, such sixty (60) day notice shall be reduced to fifteen (15) days

in order that the public not be unduly deprived of convenient and necessary services. The court shall have authority to grant preliminary and final injunctive relief and such petition shall be entitled to a speedy trial.

\* \* \*

7. To prevent or attempt to prevent by contract or otherwise any motor vehicle dealer from changing the capital structure of his dealership or the means by which or through which he finances the operation of his dealership, provided the dealer at all times meets any reasonable capital standards agreed to between the dealership and the manufacturer, distributor or wholesaler, and provided such change by the dealer does not result in a change in the executive management control of the dealership.

8. To prevent or attempt by contract or otherwise any motor vehicle dealer or any officer, partner or stockholder of any motor vehicle dealer from selling or transferring any part of the interest of any partner or stockholder of any motor vehicle dealer from selling or transferring any part of the interest of any of them to any other person or persons or party or parties; provided, however, that no dealer, officer, partner or stockholder shall have the right to sell, transfer or assign the franchise or power of management or control thereunder without the consent of the manufacturer, distributor or wholesaler except that such consent shall not be unreasonably withheld.

\* \* \*

"31–5.1–9. Renewal of franchise.—Anything to the contrary notwithstanding, it shall be unlawful for the manufacturer, wholesaler, distributor or franchisor without due cause, to fail to renew a franchise on terms then equally available to all its motor vehicle dealers to terminate a franchise or to restrict the transfer of a franchise unless the franchise shall receive fair and reasonable compensation for the value of the business."