**MAPLE SHADE MOTOR CORP., Plaintiff,**

v.

**KIA MOTORS OF AMERICA, INC., Defendants.**

Civil No. 04–2224(JEI).

United States District Court, D. New Jersey.

Aug. 26, 2005.

Bressler, Amery & Ross, P.C., by Eric L. Chase, Esq., Genevieve K. LaRobardier, Esq., Jason M. Schoenberg, Esq. Morristown, NJ, for Plaintiff.

Kirkpatrick & Lockhart LLP, by Anthony P. La Rocco, Esq., Thomas C. Weisert, Esq., Newark, NJ, by Carl J. Chiappa, Esq., Jason P. Isralowitz, Esq., New York, NY, for Defendant.

## OPINION

IRENAS, Senior District Judge.

The instant action arises from the termination of a franchise agreement between Defendant Kia Motors of America, Inc. ("KMA"), and Plaintiff Maple Shade Motor Corporation ("Maple Shade"), by KMA. Presently before the Court are the motions of Maple Shade and KMA for partial summary judgment on Count One of Maple Shade's Complaint, regarding the legality of KMA's termination of the franchise under the New Jersey Franchise Practices Act.[1]

### I.

Maple Shade was originally established as a Mazda dealership in 1972, and opened its Turnersville, New Jersey, facility in 1986. Robert Dimmerman ("Dimmerman") is the sole shareholder of Maple Shade. In 1997, Maple Shade and KMA entered into negotiations for a franchise agreement that would grant Maple Shade the right to operate a Kia dealership in Turnersville. During the negotiations, the parties discussed the construction of a separate Kia showroom at the Turnersville facility, although the substance of those discussions is now in dispute.

In or about May, 1997, KMA sent Dimmerman a standard Kia Sales and Service Agreement ("the Agreement") for his signature. The Agreement included various provisions outlining the rights and responsibilities of the proposed franchise relationship between KMA and Maple Shade. The Agreement also included an addendum amending the provisions relating to the dealership facilities ("the Addendum").

The Addendum specifically provided that Maple Shade would build a separate 1,900 square foot showroom at the Turnersville site for the Kia franchise. The Addendum also included a time table for the completion of the project, requiring Maple Shade to submit plans for the showroom to KMA by July 1, 1997, acquire the necessary permits by October 1, 1997, and complete construction by November 1, 1998.

Dimmerman signed the Agreement and Addendum, without alteration, on October 13, 1997. KMA signed the Agreement and Addendum on November 4, 1997. Maple Shade began selling and servicing Kia vehicles at its Turnersville location shortly thereafter. It did not construct a separate showroom for Kia, but instead displayed Kia vehicles in the same showroom as its Mazda models.

Relations between Maple Shade and KMA significantly deteriorated throughout the course of their six and a half year

---

**1.** The Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 over Maple Shade's claim arising under the Automobile Dealer's Day in Court Act, 15 U.S.C. § 1221 *et seq.* The Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over the remaining claims, as they are so related to the federal claim that they form part of the same case or controversy. Additionally, the Court has diversity jurisdiction over the Complaint pursuant to 28 U.S.C. § 1332. Maple Shade was incorporated in New Jersey and has its principal place of business in that state. KMA was incorporated in California and has its principal place of business in that state. The parties therefore are deemed to be citizens of different states under Section 1332(c). The amount in controversy exceeds $75,000.

association, culminating in KMA's termination of Maple Shade's Kia franchise.[2] (March 17, 2004, S. Pickard Letter, Schoenberg Cert., Ex. U.) In a series of letters and meetings starting in the spring of 1999, the parties disagreed on the adequacy of Maple Shade's sales performance and commitment to the Kia franchise, as well as whether Maple Shade was contractually obligated to build a separate showroom.

KMA expressed its displeasure at what it perceived to be Maple Shade's poor sales performance, twice sending Maple Shade Notices to Cure and giving the dealership probationary periods to improve its sales. Maple Shade repeatedly contested the methods by which KMA measured sales performance, and argued that problems with the quality and supply of Kia vehicles undercut its sales efforts.

On many occasions, KMA also pressed Maple Shade to fulfill its agreement to build a separate Kia showroom in Turnersville. Although Maple Shade submitted a proposal for a showroom in 2001 which was approved by KMA, it continued to maintain that it was not contractually obligated to build the showroom. Instead, Maple Shade claimed that it received an oral assurance from a KMA representative at the time it entered into the Agreement that it would not have to build a separate showroom unless Mazda refused to allow the display of Kia vehicles in the existing showroom or business justified the expansion. Maple Shade also maintained that its existing facilities were more than adequate and KMA had acquiesced to its continued display of Kia vehicles in the shared showroom. KMA denied that such an

agreement was made or that it consented to the shared showroom.

Beginning in June, 1999, KMA's letters also warned Maple Shade that it would consider terminating the franchise if the dealership did not fulfill its obligations under the Agreement. Maple Shade objected to what it characterized as KMA's threats and unreasonable standards, and repeatedly invoked the provisions of the New Jersey Franchise Practices Act.

The March 17, 2004, franchise termination letter outlined a series of areas in which KMA asserted that Maple Shade was not in compliance with its obligations under the Agreement. (March 17, 2004, S. Pickard letter, Schoenberg Cert., Ex. U.) First, KMA asserted that Maple Shade's sales performance fell far below average standards. (*Id.*) Relying on a measurement called the Kia Sales Proficiency index ("KSP"), KMA claimed that Maple Shade's sales record for 2003 was only 17.72% of the dealer average for the region, and noted that Maple Shade sold only 88 Kias during the year.[3] (*Id.*) KMA concluded that this poor sales performance was a breach of Maple Shade's contractual obligation to "vigorously and aggressively sell and promote Kia products." (*Id.*)

KMA attributed Maple Shade's poor sales record to a range of deficiencies, including the failure to build a separate Kia showroom. (*Id.*) KMA stated that Maple Shade agreed to build the showroom when it became a Kia dealer, and noted that it had repeatedly complained about Maple Shade's failure to fulfill this obligation. (*Id.*) KMA also expressed its displeasure with Maple Shade's failure to

---

**2.** It appears that Maple Shade continues to sell Kia vehicles. As of August, 2005, Kia's website lists Maple Shade as a dealer. Kia Dealer Locator, http://www.kia.com/dealer.php (search "08012"). Maple Shade's website displays the Kia logo and includes a short description of its Kia dealership. Maple

Shade Mazda, http://www.msmazda.com/dealer—index.html.

**3.** Maple Shade's sales peaked in 2001, when it sold 165 new Kias. It sold 145 Kias in 2002 and 88 in 2003.

maintain an adequate Kia sales staff, stock and market the full Kia product line, or generally devote substantial effort to the Kia dealership. (*Id.*)

On May 17, 2004, Maple Shade filed a Complaint in the District of New Jersey seeking a permanent injunction against the termination, as well as equitable and declaratory relief, and compensatory and punitive damages. The Complaint includes eight counts alleging: (1) violation of New Jersey Franchise Practices Act ("NJFPA"), N.J.S.A. § 56:10–5; (2) violation of NJFPA, N.J.S.A. § 56:10–7(e); (3) violation of NJFPA, N.J.S.A. §§ 56:10–7.4(a), (d), (g), (h); (4) violation of the public policy of the State of New Jersey; (5) violation of the Automobile Dealers Day in Court Act, 15 U.S.C. §§ 1221–1226; (6) violation of New Jersey Uniform Commercial Code, N.J.S.A. § 12A:2–306, 12A:1–203; (7) breach of contract; and (8) breach of the implied covenant of good faith and fair dealing. The parties have filed cross-motions for partial summary judgment as to the first count only.

## II.

Under Fed.R.Civ.P. 56(c) a court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The non-moving party may not simply rest on its pleadings to oppose a summary judgment motion but must affirmatively come forward with admissible evidence establishing a genuine issue of fact. *Id.*

In deciding a motion for summary judgment, the court must construe the facts and inferences in a light most favorable to the non-moving party. *Pollock v. American Tel. & Tel. Long Lines,* 794 F.2d 860, 864 (3d Cir.1986). The role of the court is not to "weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## III.

■ Count One of the Complaint alleges that KMA's termination of Maple Shade's Kia franchise violated the NJFPA. The NJFPA's purpose is "the protection of franchisees who have conscientiously striven to carry out their obligations under the franchise agreement ..." and not "to prevent the severance of those who deliberately disregard reasonable requirements contained in their contract with the franchise." *Amerada Hess Corp. v. Quinn,* 143 N.J.Super. 237, 254, 362 A.2d 1258 (Law Div.1976). *See also Dunkin' Donuts of Am., Inc., v. Middletown Donut Corp.,* 100 N.J. 166, 178, 495 A.2d 66 (1985)("[The NJFPA] ... does not compensate those franchisees who have lost their franchises as a result of their own neglect or misconduct.").

The New Jersey Franchise Practices Act ("the Act") provides that a franchisor may not terminate a franchise unless it has good cause to do so. N.J.S.A. § 56:10–5 (1971). Good cause is defined as "limited to failure by the franchisee to substantially comply with those requirements imposed upon him by the franchise."[4] N.J.S.A. § 56:10–5.

---

4. No court has resolved the issue of whether good faith by the franchisor is also required. *See Gen. Motors Corp. v. New A.C. Chevrolet, Inc.,* 263 F.3d 296, 321 n. 11 (3d Cir.2001).

This Court also declines to address the issue, as "even were we to assume *arguendo* that a franchisor's motivation bears on the 56:10–5

■ " '[S]ubstantial compliance' is surely something less than absolute adherence to every nuanced term of an agreement, but substantial compliance—at a minimum—requires that the franchisee refrain from acting in direct defiance of a term of the Agreement." *Gen. Motors Corp. v. New A.C. Chevrolet, Inc.,* 91 F.Supp.2d 733, 740 (D.N.J.2000). Courts have held that a franchisee was not in substantial compliance with the terms of the franchise agreement when it operated a franchise of another automobile manufacturer without the prior consent of the franchisor, *id.;* violated federal gas pricing regulations by overcharging its customers, *Amerada Hess,* 143 N.J.Super. at 254–55, 362 A.2d 1258; and underreported sales to the franchisor in order to avoid paying fees and taxes, *Dunkin' Donuts,* 100 N.J. at 179, 495 A.2d 66, *see also Jiffy Lube Int'l, Inc. v. Weiss Bros., Inc.,* 834 F.Supp. 683 (D.N.J.1993).

The parties dispute whether Maple Shade's failure to build a separate Kia showroom was good cause for KMA's termination of Maple Shade's Kia franchise. KMA maintains that Maple Shade was obligated to build the showroom by the terms of the Addendum, and that failure to do so was a material breach of the Agreement. Maple Shade argues that the provision of the Addendum regarding the showroom is void and unenforceable, and so the franchise could not be terminated on the ground that Maple Shade had not built the separate showroom. Additionally, Maple Shade contends that it has substantially

complied with the other facilities provisions of the Agreement.[5]

Resolution of this dispute requires the Court to answer two related questions. First, was Maple Shade obligated to build the separate Kia showroom? If so, would its failure to do so provide "good cause" for the termination of the franchise under the NJFPA? After review of the parties' arguments and evidence, the Court concludes that the answer to both questions is yes.

### A.

■ Maple Shade expressly agreed to build a separate showroom for its Kia franchise. The Addendum states: "DEALER agrees to *construct an exclusive 1,900 square foot Kia showroom at 3000 Black Horse Pike in Turnersville, New Jersey* according to the timetable set forth below...." (Schoenberg Cert., Ex. D, emphasis in original.) The timetable provides that Maple Shade must submit plans for the showroom to KMA by July 1, 1997, acquire the necessary permits by October 1, 1997, and complete construction by November 1, 1998. The Addendum does not place any conditions on the requirement to build a separate Kia showroom.

Maple Shade contends that the agreement to build a separate Kia showroom was *void ab initio* because the first two dates in the timetable had already passed when the Agreement was signed, making performance impossible. Despite the fact that the Agreement and Addendum were not signed by Maple Shade until October

'good cause' inquiry, [Maple Shade] has failed to furnish record evidence sufficient to create a genuine issue as to whether [KMA] acted in good faith (or without a pretextual motive) in terminating [Maple Shade's Kia] franchise." *Id.* at 320–21.

**5.** Maple Shade also contests the methods used by KMA to measure sales performance, and

argues that KMA did not have good cause to terminate the Maple Shade franchise based upon poor sales performance. Given the Court's holding that Maple Shade's failure to build a separate Kia showroom was sufficient to justify the termination of the franchise, the Court will not address Maple Shade's other contentions.

13, 1997, and by KMA on November 4, 1997, the agreement to build a showroom is still valid. The heart of the Addendum is the obligation to construct a separate showroom, which was not impossible in any sense of the word at the time the Agreement and Addendum were signed.[6]

The particular timetable chosen gave Maple Shade eighteen months to complete the project from the date the Agreement was negotiated and forwarded to Maple Shade. The Court notes that the timeframe in the Addendum reflects Dimmerman's own estimation of how long it would take him to develop the plans, acquire the necessary permits and construct the showroom. (Dealer Candidate Report, Schoenberg Cert., Ex. C.) There is no evidence in the record to suggest that these dates held any importance independent from the eighteen-month timeframe proposed by Dimmerman.[7]

■ The fact that Maple Shade did not execute the Agreement and return it to KMA until after the first two deadlines had passed does not undermine the basic understanding of the Addendum that Maple Shade would construct a separate showroom. A defect in a less critical term does not render the essential agreement unenforceable, if the intent of the parties is clear. *See Satellite Entm't Ctr., Inc. v. Keaton,* 347 N.J.Super. 268, 277, 789 A.2d

662 (App.Div.2002); *Hennefer v. Butcher,* 182 Cal.App.3d 492, 227 Cal.Rptr. 318, 322 (1986).[8] Given that the words of the Addendum clearly establish that the parties intended Maple Shade to build a separate Kia showroom, the Court would be permitted to imply a reasonable timetable to replace the past-due deadlines. *Satellite Entm't Ctr.,* 347 N.J.Super. at 277, 789 A.2d 662.

■ Maple Shade also maintains that at the time the Addendum was negotiated, it received an oral assurance from a KMA representative that it was only required to build a showroom if Mazda did not agree to share the existing facilities with Kia. As a result of Mazda's consent to the dualing arrangement, Maple Shade claims its agreement to build a separate Kia showroom became "moot." (Pl. Br. Opp. Def. Mot. Partial Summ. J. at 17.)

It is axiomatic that, when a contract contains an integration clause, prior or contemporaneous oral agreements are inadmissible to vary the terms of a final written contract. 11 Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts § 33:1 (4th ed.1993); *Ocean Cape Hotel Corp. v. Masefield Corp.,* 63 N.J.Super. 369, 378, 164 A.2d 607 (App. Div.1960); *Garden State Plaza Corp. v. S.S. Kresge Co.,* 78 N.J.Super. 485, 496,

---

**6.** In construing the Addendum, the Court is guided by the rule that it should adopt a construction which renders the contract valid and effective, where possible. *Goldberg v. Commercial Union Ins. Co. of N.Y.,* 78 N.J.Super. 183, 190, 188 A.2d 188 (App.Div.1963); *Titan Group, Inc. v. Sonoma Valley County Sanitation Dist.,* 164 Cal.App.3d 1122, 211 Cal.Rptr. 62, 65 (1985). The Court notes that Maple Shade promotes an interpretation of the Addendum that renders it ineffective.

**7.** The first letter from KMA regarding Maple Shade's failure to construct the showroom was dated April 27, 1999, approximately eighteen months after the parties entered into the

Agreement. (Weisert Cert. Supp. Def. Mot. Partial Summ. J., Ex. 3.) The Court may consider such extrinsic evidence to explain the parties' written agreement. *Seidenberg v. Summit Bank,* 348 N.J.Super. 243, 256–57, 791 A.2d 1068 (App.Div.2002); *Denver D. Darling, Inc. v. Controlled Env'ts Constr., Inc.,* 89 Cal.App.4th 1221, 108 Cal.Rptr.2d 213, 223 (2001).

**8.** The Agreement provides that California substantive law governs the interpretation of the contract. Neither party argues that California law differs from New Jersey law on the issues in this case. Therefore, the Court will cite to the law of both states.

189 A.2d 448 (App.Div.1963); Cal. Comm. Code § 2202; Cal.Code Civ. Proc. § 1856. Here, Part XVI.M of the Agreement,[9] signed by Dimmerman, expressly provides that "there are no other agreements or understandings either oral or written between the parties affecting this Agreement or relating to any of the subject matters covered by this Agreement.... This agreement cancels and supersedes all previous agreements between the parties that relate to any matters covered herein, ..." The written terms of the Addendum[10] provide without condition that Maple Shade was required to build a separate Kia showroom, and any prior or contemporaneous oral agreement does not negate that obligation.[11]

▮ Alternatively, Maple Shade argues that KMA waived or should be estopped from enforcing the facilities provision of the Addendum. However, KMA insisted upon the construction of the Kia showroom throughout its relationship with Maple Shade. The record contains at least nine letters from KMA to Maple Shade sent prior to the termination notice in which KMA reiterated its insistence that Maple Shade build a separate showroom as provided by the Addendum. (Weisert Cert. Supp. Def. Mot. Partial Summ. J., Exs. 3, 5, 7, 15, 17; Weisert Cert. Opp. Pl. Mot. Partial Summ. J., Ex. 6; Busch Decl., Ex. C; Schoenberg Cert., Exs. TT, ZZ.) KMA also specifically disputed Maple Shade's assertion that it was only obligated to build a separate Kia showroom if business justified such a step. (Busch Decl., Ex. C; Schoenberg Cert., Ex. TT.)

Even though KMA did not mention Maple Shade's obligation to build a separate showroom in every direct or indirect communication regarding the dealership's performance of its contractual obligations, this failure does not constitute a waiver of the provision by KMA. The Agreement specifically states that "[t]he delay or failure of COMPANY or DEALER to require performance by the other party or the waiver by COMPANY or DEALER or the breach of any provision of this Agreement will not affect the right to subsequently require such performance." (Agreement, XVI.G.) KMA's course of conduct reflects a strategy of inducing Maple Shade to comply in order to salvage the franchise relationship, rather than demonstrating any acceptance of the existing facilities arrangement.

## B.

▮ The Court concludes that Maple Shade's failure to build a separate Kia showroom justifies the termination of its Kia franchise by KMA. The Addendum specifically provides that the construction of the Kia showroom is a material term of the Agreement. (Schoenberg Cert., Ex. D.) It also states that failure to construct the showroom is grounds for the nonrenewal of the Agreement. (Id.) Moreover, KMA's letters put Maple Shade on notice that its noncompliance with the terms of the Agreement and Addendum put its franchise at risk of termination. (Weisert Cert. Supp. Def. Mot. Partial Summ. J., Exs. 5, 6, 7, 15, 17.)

No court has addressed the issue of whether under the NJFPA a franchisee's failure to build a separate facility in con-

---

**9.** Part XVI.M is captioned "SOLE AGREEMENT OF PARTIES."

**10.** The Agreement and the Addendum were both signed by Maple Shade on October 13, 1997, and by KMA on November 4, 1997, and should be considered a single, integrated contract.

**11.** To the extent that Maple Shade may argue that a subsequent oral agreement amended its contract with KMA, Part XVI.M also states that "no change in, addition to ... or erasure of any printed portion of this Agreement will be binding unless it is approved in a written amendment to this Agreement."

travention of an agreement with the franchisor is sufficient to establish good cause for the termination of the franchise. However, several courts have found such a breach to justify termination under the franchise protection acts of other states.

In *Autohaus, Inc. v. BMW of North Am., Inc.*, No. Civ. A. 92–10403–MA, 1993 WL 1503945 (D.Mass. Dec.23, 1993), the District of Massachusetts held BMW had "good cause" to terminate the franchise under Massachusetts law because Autohaus failed to relocate its BMW operations to a separate facility. Autohaus signed eight separate agreements with BMW, spanning twenty-one years, which included a promise to relocate the BMW franchise from the facility it shared with three other franchises operated by Autohaus. *Id.* at *2. The Court rejected Autohaus's argument that BMW condoned its use of the shared facility, and concluded that BMW "unquestionably acted with 'good cause' in terminating Autohaus' BMW dealership." *Id.* at *8.

The District of Rhode Island concluded that the Rhode Island Dealer's Law gave a franchisor the power to terminate a franchise when the franchisee failed to abide by the relocation provisions of a refranchising agreement. *Scuncio Motors, Inc. v. Subaru of New England, Inc.*, 555 F.Supp. 1121, 1136–37 (D.R.I.1982) (holding that termination of the franchise by Subaru of New England was not done in bad faith). *See also Dunne Leases Cars & Trucks, Inc. v. Kenworth Truck Co.*, 466 A.2d 1153 (R.I.1983) (failure to establish separate facility for truck-tractor dealership was a material breach of contract justifying termination of franchise).

The same result is called for here. The separate Kia showroom was an important part of the franchise negotiations and agreement. KMA informed potential franchisees of its desire for a separate showroom for Kia from the outset of its contacts with potential franchisees. (Candidate Evaluation Summary, Schoenberg Cert., Ex. C.) The April 25, 1997, Dealer Candidate Contact Report for Maple Shade indicates that Dimmerman discussed and committed to the construction of a separate Kia showroom with the KMA representative.[12] (Schoenberg Cert., Ex. C.) KMA's Candidate Evaluation Summary of the Turnersville-area dealerships also reveals the importance KMA placed on a separate Kia showroom. (*Id.*) The brief discussions of the other dealerships contacted show a focus on the available space for an additional Kia showroom. (*Id.*)

The parties agree that the showroom construction provision was separately negotiated. Although Maple Shade maintains that it reached an oral agreement with KMA that differed from the written provision, the facilities for Kia were discussed in detail and at some length. Moreover, the showroom construction provision was part of the initial franchise agreement between KMA and Maple Shade, and appears to have been an important factor in KMA's decision to grant a franchise to Maple Shade from the outset. (Weisert Cert. Supp. Def. Mot. Partial Summ. J., Ex. 7.)

Although the court in *General Motors Corp.* was presented with a different factual situation, the result there supports this Court's ruling. Judge Hochberg conclud-

---

**12.** The report states that Dimmerman believed it would take eighteen months to complete the showroom, and that he would begin the design and approval process as soon as he received a letter of intent from KMA. (Schoenberg Cert., Ex. C.)

ed that the franchisor had good cause to terminate the franchise when the franchisee added a second automobile line to its facility without the required authorization. 91 F.Supp.2d at 740. She determined that the franchisee's breach of the provision of the franchise agreement regarding changes to the location or uses of the dealership's premises amounted to less than substantial compliance with the requirements of the franchise. *Id.* at 736–40.

Maple Shade did not "substantially comply with those requirements imposed upon him by the franchise." N.J.S.A. § 56:10–5. The failure to build a separate showroom for Kia was, by itself, sufficient to establish good cause for KMA to terminate the franchise.[13] "This is especially true when, as here, the franchisee has received specific notice from the franchisor that its behavior is a violation of the agreement." *Gen. Motors Corp.*, 91 F.Supp.2d at 740. Nor has Maple Shade raised a material issue of fact with regard to the reasonableness of the facilities provision of the Addendum that would prevent the entry of summary judgment on Count One of the Complaint.

## IV.

For the reasons set forth above, the Court will grant Defendant KMA's Motion for Partial Summary Judgment on Count One of the Complaint, and deny Plaintiff Maple Shade's Motion for Partial Summary Judgment on the same count. The Court will enter an appropriate order.

**ORDER GRANTING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT (Docket No. 13) AND DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT (Docket No. 14)**

This matter having appeared before the Court upon the Motions for Partial Summary Judgment on Count One of the Complaint of Plaintiff Maple Shade Motor Corp. and Defendant Kia Motors of America, the Court having considered the submissions of the parties, and for the reasons set forth in an Opinion issued by this Court, which findings of fact and conclusions of law are incorporated herein by reference, and for good cause appearing;

**ORDERED THAT:**

1. Defendant's Motion for Partial Summary Judgment on Count One of the Complaint (Docket No. 13) is **GRANTED**.

2. Plaintiff's Motion for Partial Summary Judgment on Count One of the Complaint (Docket No. 14) is **DENIED**.

---

**13.** Maple Shade also argues that its existing facilities were more than adequate, and in fact, more attractive than other Kia dealerships in the region. (Pl. Br. Supp. Pl. Mot. Partial Summ. J. at 22.) Based on these facts, Maple Shade maintains that it substantially complied with the facilities requirements of the Agreement. Maple Shade's argument ignores the unambiguous requirement that it build a separate showroom for Kia. Its failure to build a Kia showroom, coupled with its steadfast denial of any obligation to do so, cannot be considered substantial compliance with the requirements of the Agreement and Addendum.